SOUTHERN INDIANA GAS AND ELECTRIC CO. *v.* INDIANA
STATEWIDE RURAL ELECTRIC COOPERATIVE, INC.

[No. 20,372. Filed January 9, 1968. No petition for rehearing filed.
Petition to transfer granted December 10, 1968. See 242 N. E. 2d 361.]

*G. R. Redding, John L. Wooling, Virgil L. Beeler,* of Indianapolis, *Fred P. Bamberger, Bamberger, Foreman, Oswald and Hahn,* of Evansville, *Baker & Daniels,* of Indianapolis, of counsel, for appellant.

*William C. Wolf* of Greenfield, *Ralph P. Zoercher,* of Tell City, *Willett H. Parr, Jr.,* of Lebanon, *Jeremiah L. Cadick, William E. Plane,* of Indianapolis, *Parr, Richey, Obremskey & Pederson,* of Lebanon, *Cadick, Burns, Duck and Neighbors,* of Indianapolis, of counsel, for appellee.

BIERLY, J.—This is an action in equity, whereby appellant, plaintiff below, sought to enjoin appellee:

". . . from either constructing or operating an electric utility generating plant of transmission facilities; from producing, furnishing, transmitting or selling electricity in any part of the area or to any of the customers, served by the plaintiff; from using or crossing county roads or other county property for the installation of its facilities; and from otherwise engaging as a public utility in the production, transmission, sale or furnishing of electric power, all unless and until authorized to do so by proper order of the Public Service Commission of Indiana, and in the case of using county property, unless and until properly authorized so to do by the respective counties."[1]

It appears from the record that appellee proposed to construct an electric utility generating plant and transmission facilities in order to render service to the Southern Indiana Rural Electric Cooperative, Inc., (hereinafter referred to as Southern REMC) and to the Dubois Rural Electric Coopera-

---

1. Taken from plaintiff's prayer for relief in its complaint.

tive, Inc., (hereinafter referred to as Dubois REMC), both of which are presently receiving service rendered by appellant.

The trial court found against the appellant on its complaint and entered judgment accordingly.

On appeal, appellant assigns as error the trial court's action in overruling its motion for a new trial, which motion specified that the trial court's decision was contrary to law.

At this point it would prove helpful for a better understanding of the issues, if we briefly outline the facts surrounding this action, as well as the nature of the parties' operations.

Appellant was initially organized in 1912 under the name "Public Utilities Company," and in 1921 its name was changed to its present form. As of mid-1964, it asserts that its total investment in electric utility plants was $78,072,891.00. As of the time of the filing of the complaint, its cost of operation of electric facilities then being used to supply utility service to Southern REMC and Dubois REMC was $270,280.52. This property consists of lines, meters, transformers, substations and miscellaneous other property and equipment.

In addition to the above two REMCs, appellant renders service to residential, commercial, industrial, municipal and wholesale municipal customers in the counties of Posey, Vanderburgh, Gibson, Warrick, Spencer, Pike, Dubois and Perry. As of May 31, 1964, appellant was serving approximatey 74,377 customers directly, and 17,500 customers indirectly. The indirect customers consist of those served by the wholesale municipal and REMC customers. Appellant has served Southern REMC continuously since 1941, and Dubois REMC since 1954. The revenue received by appellant from the above two REMCs for electric utility service during 1963 amounted to $261,360.00. The revenue per year had grown in the past and the parties agreed that further growth at an increasing rate would be experienced in the future.

The Southern REMC was incorporated in 1939 under the REMC Act, (Burns' Anno. Stat. §§ 55-4401 to 55-4426, 1951

Replacement and 1967 Cum. Supp.), to distribute electricity in certain rural areas in Spencer and Posey Counties and areas to the east thereof. It does not generate its own electricity or operate the large, high voltage, transmission lines. Instead, it purchases all of its electricity from appellant and then distributes the current to the ultimate consumer.

The Dubois REMC was also incorporated in 1939, and it, like the Southern REMC, does not generate or transmit its own electricity, but purchases some from the appellant as well as some from other utilities, and distributes it to its customers.

The appellee has admitted, in its answer to appellant's complaint, that it:

> "[P]roposes to, and will unless prevented by this court, construct an electric generating plant and transmission facilities and engage as a public utility in rendering to Southern REMC and Dubois REMC, as well as others, the electric utility services which is presently being, and for many years has been, rendered by the plaintiff."

The possibility of generation of electric energy by the REMCs had been under consideration and discussion for a number of years. The motivating factor was the REMCs' desire to obtain electricity at the lowest possible rate, and under the present set-up the public service commission approved these rates between appellant and appellee.

As a result, the appellee, along with several member REMCs, organized the Hoosier Cooperative Energy, Inc., as a not-for-profit corporation in 1949, and as a vehicle for generating electrical energy.

Several studies were made concerning the feasibility of a generating program. None of these studies advanced beyond the planning stage until June of 1961, when the REA approved a loan to Hoosier Cooperative Energy, Inc., for a generation and transmission project.

Hoosier Cooperative Energy, Inc., planned to receive Public Service Commission authorization of this proposed genera-

tion and transmission, and then construct a generating plant near Petersburg, Indiana, for the transmission of electricity to some sixteen [16] local REMCs.

On December 18, 1961, Hoosier Cooperative Energy, Inc., filed with the Public Service Commission its petition for a certificate of convenience and necessity to construct, maintain and operate a generating station and transmission system.

Several utilities, including appellant, intervened and opposed the project as being unnecessary, uneconomical, and not in the public interest. Thereafter, arrangements were made to transfer the REA loan from Hoosier Cooperative Energy, Inc., to the appellee. On April 25, 1962, Hoosier Cooperative Energy, Inc., dismissed its petition before the commission.

On May 14, 1962, the traditional ground breaking ceremony was held near Petersburg, Indiana. Appellant then filed this action on June 1, 1962.

For purposes of this appeal there appears three issues for our determination. The first would be whether or not the appellee has the authority to proceed with its generation and transmission plans, and if this is found to be in the affirmative, where does it derive this authority, from the statute or from the Public Service Commission? The second issue concerns itself with non-user. That is, even assuming appellee had the authority to proceed with its plan, has it lost this authority by reason of lapse through non-user? The third and final issue is the question of whether appellant is a proper party to bring an action asserting such loss of revenues and capital invested to extend services to REMCs.

We are of the opinion that a literal interpretation of the statute creating the REMCs leaves little room for doubt as to whether the power to generate is present.

Under § 55-4411, it is provided that:

"A corporation created under the provisions of this act shall have power to do any and all acts or things necessary

or convenient for carrying out the purpose for which it was formed, including, but not limited to:

. . .

"(d)   To acquire, own, operate, maintain and improve a system or systems."

Under § 55-4403, the word "system" is defined as follows:

"(e)   'System' shall mean and include any plant, works, system, facilities or properties, together with all parts thereof and appurtenances thereto, used or useful in the generation, production, transmission or distribution of energy."

Section 55-4417 provides for rates and states that:

". . . A reasonable and just charge for service within the meaning of this section shall be such charges as shall produce sufficient revenue to pay all legal and other necessary expense incident to *the operation of its system,* . . . ." (emphasis added).

Also, under § 55-4421, it is provided that:

"A general district corporation is a corporation formed under this act for the purpose of furnishing *services* to local district corporations." (emphasis added).

Services is defined under § 55-4403 to mean:

"(m)   'Service' or 'services' shall mean the furnishing of energy and the rendering of engineering, financial, accounting or educational services incidental to the *production, transmission,* or use of energy, . . . or any of the same." (emphasis added).

It appears obvious that this power to generate was granted to the REMCs under the act. The problem arises in attempting to determine what role the Public Service Commission plays concerning this power and the REMCs.

Under § 55-4405, provision is made for the filing of the articles of incorporation of the REMCs with the Public Serv-

ice Commission. The Commission is then directed to hold a public hearing, and,

"... after hearing the evidence introduced at said hearing shall enter a finding either that the convenience and necessity of the public proposed to be served in the territory in which the operations of the corporation are to be conducted will or will not be served by the organizations and operations of the proposed corporation. If such finding be in the affirmative, the commission shall enter an order approving the organization of such corporation and the proposed articles of incorporation and shall attach a copy of said order to each copy of the said articles of incorporation.

"... As soon as the provisions of the section have been complied with, the proposed corporation described in the articles so filed, under its designated name, shall be and constitute a body corporate."

Under this statute, as we interpret it, the Public Service Commission's function is to determine the desirability of having an REMC in a given territory. In so doing, their guideline is that the "convenience and necessity" of the territory will be served. If the commission determines this question in the affirmative, it enters an order to that effect. The commission, however, did not determine what the powers of the REMCs were, for the powers are listed in the statute itself.

Having determined that the REMCs do possess the necessary power to commence a generation program, we must next determine whether the same can be lost through non-user.

The appellant states the general principle of non-user to be:

"... even though a right may once have been granted to the utility to render public service, if that utility fails to use the right and fail to render the service, and another utility provides the facilities, renders the service and fulfills the public need over a period of years, the unused right of the first utility will lapse and cease to exist."

As authority for this principle, appellant cites the following two Indiana cases: *City of Huntington* v. *Northern Ind. Pow-*

*er Co.* (1937), 211 Ind. 502, 5 N. E. 2d 889; *Public Service Co. of Ind.* v. *City of Newcastle* (1937), 212 Ind. 229, 8 N. E. 2d 821.

In the *City of Huntington* case, *supra,* the Northern Indiana Power Company filed suit to prevent the city from engaging in domestic and commercial lighting, distribution, and sale of electric current in the City of Huntington. The complaint, in that case,

"... alleged that the city of Huntington is not and never has been engaged as a utility in the production and sale of electric current for domestic or commercial purposes, but for many years has owned and operated an electric generating plant for the purpose of producing current to light the streets and public buildings, and for strictly municipal purposes; that on the 1st day of January, 1935, the city of Huntington, through its officers and employees, without qualifying as a public or municipal utility and without complying with the requirements of law, threatened to proceed, and unless enjoined would proceed, unlawfully to engage in domestic and commercial lighting in the city of Huntington to the irreparable damage of appellee."

The appellant in that case contended that it was, on January 1, 1935, and for many years prior to that date, a municipal utility, and had a right to extend its operations.

In *City of Huntington, supra,* the trial court in its judgment and findings:

"... decreed that the appellee and its predecessors owned and operated the sole and only utility lawfully engaged in the generation of electric current for domestic and commercial purposes, under a franchise issued from said city, until June 23, 1923, when the franchise was surrendered and an indeterminate permit was granted by the Public Service Commission of Indiana; That the city of Huntington was not on, or prior to, January 1, 1935, engaged in the business of furnishing electric current for domestic and commercial purposes.

"The judgment further enjoined the appellants from extending its electric system to the homes and places of business in the city of Huntington, . . . ."

It was held by the Indiana Supreme Court on appeal, that the City of Huntington had lost any right it may have had to operate as a public utility. Chief Justice Tremain stated:

> "Appellants rely upon the fact that in 1914 the city was granted permission to distribute electricity for domestic and commercial purposes. However, this authority was never exercised. The city will not be permitted to hold such right in a dormant state, and, after a public utility has operated under legal authority for many years and expended large sums to serve the public, undertake to operate under the condition here presented.
>
> . . .
>
> ". . . when the Public Service Commission of Indiana, in 1914, granted to the city of Huntington, authority to engage in domestic and commercial lighting, it must use that grant for public benefit. It was granted upon the implied condition that it would be so used. The non-user for more than twenty years amounted to a forfeiture. Also, see *Capital City Light & Fuel Co.* v. *Tallahassee* (1902), 186 U.S. 401, 411, 22 S. Ct. R. 866; *Kavanaugh* v. *St. Louis* (1909), 220 Mo. 496, 119 S.W. 552; *State ex rel* v. *East Fifth Railway Co.* (1897), 140 Mo. 539, 41 S.W. 955, 38 L.R.A. 218, 62 Am. St. Rep. 742; *Louisville Trust Co.* v. *Cincinnati* (1896), 76 Fed. 296, 22 C.C.A. 334; *Security Trust Co.* v. *Grosse Pointe* (1929), 32 Fed. 2d 706; *Cawker* v. *Meyer* (1911), 147 Wis. 320, 133 N.W. 157, 37 L.R.A. (NS) 510; *Allen* v. *Railroad Commission* (1918), 179 Cal. 68, 175 Pac. 466, 8 A.L.R. 249."

But a vigorous dissenting opinion was rendered by Judge Treanor, as follows:

### DISSENTING OPINION

"TREANOR, J. DISSENTING.—Under the law of Indiana the municipality of Huntington in 1914 acquired full power to own and operate a public utility. The fact that the operation of a utility is treated by the law of this state as a non-governmental function does not change the fact that the municipality of Huntington acquired the legal power to engage in the business of operating the utility. I do not believe that this power can be lost by non-users. The fact that public officials of Huntington did not immediately proceed in the business of furnishing electric power to pri-

vate individuals cannot be utilized by the appellee as a legal ground for forfeiture of such power by the municipality of Huntington. To allow the contention of appellee in this case runs counter to the general rule that prescriptive rights cannot be acquired against the State or its political subdivisions, and the corollary that the failure of officials to take action to assert rights or powers of the State or its subdivisions cannot be taken advantage of to acquire prescriptive rights by private individuals.

"The power of a municipal corporation to own and operate a public utility belongs to it as a political subdivision of the state; and the quality of the power is not different from the power to carry on strictly governmental activities. The classification of municipal functions into governmental and non-governmental has been used chiefly as a basis for relieving municipalities from liability for negligence of agents; but the considerations therein involved afford no logical basis for the conclusion that a municipal corporation can lose rights or powers by non-user even though these relate to non-governmental functions.

"Furthermore, courts have no power to grant indeterminate permits to persons or corporations, private or municipal, to engage in the business of a public utility. Nor do they have power to revoke such permits either directly by adjudicating a cause for revocation or indirectly by adjudicating a forfeiture. If cause for forfeiture exists the only tribunal which has jurisdiction legally to determine the existence of that cause is the Public Service Commission of Indiana, subject only to the limited judicial review allowed by law. The Public Service Commission has not entered any order of revocation of the indeterminate permit which the Commission granted to the city of Huntington; and in the absence of such revocation the Huntington Circuit Court had no power to enjoin the city of Huntington from acting as a public utility."

We quote the dissent above to show the lack of unanimity of the members of the Supreme Court on the question of the issue of a non-user.

In the case of *Public Service Co. of Ind.* v. *City of Newcastle, supra,* the appellant brought an action seeking an injunction against the city when the latter threatened to encroach upon appellant's utility business in the city.

Evidence in said cause showed no ordinance had been adopted relative to construction of electric power plant; that no resolution or ordinance of the city council had declared an intention to authorize or permit the city officials, or its employees, to engage in business as a public utility, and that no election had been held on the question as to whether the city should engage in the business as a public utility; that no application was ever made to the Public Service Commission of Indiana or a certificate of convenience and necessity authorized the city to engage in business as a public utility.

The Supreme Court in its lengthy opinion narrated a history of the attempt by the city of Newcastle to construct and operate a public utilities. While the Henry Circuit Court found for the appellee on suit for injunctive relief filed by the appellant, the Supreme Court, in reversing the trial court, said that the city's action:

". . . indicated a desire to maintain a technical status— to preserve whatever legal rights the city might have had rather than a present intention to dedicate its plant, if it then had a plant adapted to serve the public, to a public use. A franchise or right to serve the public as a public utility is contingent upon use, and may lapse or be forfeited by non-user."

The two cases cited above do not appear to be analogous to the case at bar.

It is the contention of the appellee in the case at bar that a corporate power granted by statute is not lost in the same manner as corporate power conferred by a governmental regulatory agency or body. The appellee further points out, and we are in agreement, that both the *Huntington* case, *supra,* and the *Newcastle* case, *supra,* did not involve a grant of legislative statutory power but involved a franchise authorizing a grant by the Public Service Commission.

In the *Huntington* case, *supra,* the Supreme Court, at page 517, said:

"If the City of Huntington was or is engaged in rendering service for domestic and commercial purposes, as it contends, it is in no better or different position from an independent corporation holding a permit from the Public Service Commission which it has not exercised by serving the public. The City of Huntington waited for more than twenty years after it was granted a permit by the Public Service Commission before it made an effort to serve the public, and when it did make an effort it did not do it in the manner prescribed by statute."

The Public Service Commission issues a permit when it determines there is a present public need for the exercise of rights granted in the permit. Thereupon the Public Service Commission issues a "Certificate of Public Convenience and Necessity." Should such a permittee fail to render service authorized by such certificate the public may be injured by such failure to comply with the said certificate, and such failure by non-user may result in the loss of power to the permittee. On the other hand, this situation and result would not occur when there is a specific legislative grant of power as is contained in the REMC Act.

Hence, it is our opinion that as long as the power exists in the statute creating the REMC, it cannot be lost through non-user. It appears to us that the only way this power can be destroyed is by repeal by legislation, or by direct attack on the statute as to its constitutionality. The REMC Act itself contains no provision that the power is lost should it not be exercised for any period of time, and were we to hold that this statutory corporate power has been lost by non-user, it would in effect be an amendment of the statute.

As in the *Huntington* case, *supra,* as well as in the case at bar, the trial court held that the question as to whether the corporate power had been lost through non-user was a question of fact presented to the trial court. The trial court in the case at bar, in its general finding, held that such power had not been lost. Whether appellee has indicated an intent to

abandon its power was also a fact question which the trial court decided in the negative.

The contracts between the appellant and the Southern REMC, and also the Dubois REMC, contain an attached schedule of rates, and to meet statutory requirements, the contracts need be filed with the approval of the Public Service Commission. No indeterminate permits were issued to appellant in respect thereto.

We recognize that appellant possesses a property right in respect to his franchises, certificates and indeterminate permits, and thus are entitled to protection should unlawful interference with these rights arise. *Kosciusko County, etc.* v. *Public Service Comm.* (1948), 225 Ind. 666, 77 N. E. 2d 572.

In the case at bar, appellee, as authorized by statute, proposes to generate and sell electric energy to its members, to wit: local district corporations, and thence the local district corporations will serve the patron consumers in such territory assigned to them by provision of their articles of incorporation which the Public Service Commission has approved.

Appellant's rights to supply energy to the two (2) REMCs are based on contracts subjected to expire at a given time. The Public Service Commission gave its approval to these contracts. When the contracts expire the contractual rights of appellant cease.

The claim of appellant reduced to its simplest terms seeks an injunction against the REMC, a corporate entity, which has statutory incorporate authority to generate and transmit electric energy, to enjoin such REMC from entering into competition with appellant in the sale of such energy at wholesale to appellee's members.

We are of the opinion that appellant is not entitled to such an injunction, inasmuch as it is not entitled to go scot-free of lawful competition. The Federal Court, in the case of *Alabama Power Co.* v. *Ickes* (1938), 302 U.S. 464, 82 L. Ed. 374, and the *Tennessee Electric Power Co.* v.

*the T.V.A.* (1939), 306 U. S. 118, 83 L. Ed. 543, set forth fundamental principles relative to their constitutionality and to the matter of lawful competition. The Supreme Court, in the *T.V.A.* case, *supra,* at page 139, said:

> "*The vice of the position is that neither their charters nor their local franchises involved the grant of a monopoly or render competition illegal.* The franchise to exist as a corporation, and to function as a public utility, in the absence of a specific charter contract on the subject, creates no right to be free of competition, and affords the corporation no legal cause of complaint by reason of the state's subsequently authorizing another to enter and operate in the same field." (emphasis supplied).

We are of the opinion that the Federal Court cases listed above contain underlying principles closely analogous to the case at bar.

Evidence of probative value shows that competition between appellant and appellee will not arise in reference to geographic boundaries of the areas where each is given authority to act; that the issue resolves about the contention of appellant that it is entitled to be free from competition in the wholesale sale of electric energy to the two (2) REMCs. The appellant is not entitled to be free in this field, and deserves no injunction against the proposed plan of appellee.

Due to appellant's failure to demonstrate reversible error in the case at bar, we shall not discuss more fully appellee's contention that the issue of forfeiture may not be presented by appellant.

Having determined no reversible error we are of the opinion that the judgment of the trial court should be affirmed.

Judgment affirmed.

Carson, C. J., and Prime, J., concur.

Cooper, J., dissents with opinion in which Cook and Pfaff, JJ., concur.

Faulconer and Smith, JJ., not participating.

## DISSENTING OPINION

COOPER, J.—This is an action in equity, whereby Appellant, Plaintiff below, sought to enjoin the Appellee:

> ". . . from either constructing or operating an electric utility generating plant of transmission facilities; from producing, furnishing, transmitting or selling electricity in any part of the area or to any of the customers, served by the plaintiff; from using or crossing county roads or other county property for the installation of its facilities; and from otherwise engaging as a public utility in the production, transmission, sale or furnishing of electric power, all unless and until authorized so to do by proper order of the Public Service Commission of Indiana, and in the case of using county property, unless and until properly authorized so to do by the respective counties."[1]

It appears from the record that Appellee proposed to construct an electric utility generating plant and transmission facilities in order to render service to the Southern Indiana Rural Electric Cooperative, Inc., (hereinafter referred to as Southern REMC) and to the Dubois Rural Electric Cooperative, Inc., (hereinafter referred to as Dubois REMC) both of which are presently receiving service rendered by the Appellant.

The trial court found against the Appellant on its complaint and entered judgment accordingly.

On appeal, the Appellant assigns as error the trial court's action in overruling its motion for a new trial, which motion specified that the trial court's decision was contrary to law.

In reviewing the record and briefs filed and now before the Court, we find a concise statement of the pertinent facts contained in the record to be as follows:

Appellant was initially organized in 1912 under the name "Public Utilities Company," and in 1921 its name was changed to its present form. As of mid-1964, it asserts that its total investment in electric utility plants was $78,072,891.00. As of

---

1. Taken from plaintiff's prayer for relief in its complaint.

the time of the filing of the complaint, its cost of electric facilities then being used to supply utility service to Southern REMC and Dubois REMC was $270,280.52. This property consists of lines, meters, transformers, substations, and miscellaneous other property and equipment.

In addition to the above mentioned two REMCs, the Appellant renders service to residential, commercial, industrial, municipal and wholesale municipal customers in the counties of Posey, Vanderburgh, Gibson, Warrick, Spencer, Pike, Dubois and Perry. As of May 31, 1964, Appellant was serving approximately 74,377 customers directly, and 17,500 customers indirectly. The indirect customers consist of those served by the wholesale municipal and REMC customers. Appellant has served Southern REMC continuously since 1941, and Dubois REMC since 1954. The revenue received by the Appellant from the above mentioned two REMCs for electric utility service during 1963 amounted to $261,360.00. The revenue per year had grown in the past and the parties agreed that further growth at an increasing rate would be experienced in the future.

The Southern REMC was incorporated in 1939 under the REMC Act (Burns' Anno. Stat. §§ 55-4401 to 55-4426, 1951 Repl. and 1967 Cum. Supp.), to distribute electricity in certain rural areas in Spencer and Posey Counties and areas to the east thereof. It does not generate its own electricity or operate high voltage transmission lines. Instead, it purchases all of its electricity from the Appellant and then distributes the electric current to the ultimate consumer, by its own lines.

The Dubois REMC was also incorporated in 1939, and it, like the Southern REMC does not generate or transmit its own electricity, but buys electricity from the Appellant and other utilities, and distributes by its own lines to its customers.

The Appellee has admitted in its answer to the Appellant's complaint, that it:

"[P]roposes to; and will unless prevented by this court, construct an electric generating plant and transmission facilities and engage as a public utility in rendering to Southern REMC and Dubois REMC, as well as others, the electric utility services which is presently being, and for many years has been, rendered by the plaintiff."

It appears that the possibility of generating electric energy by the REMCs or some of them, had been under consideration and discussion for a number of years. The motivating factor was the REMCs' desire to obtain electricity at the lowest possible rate, and under the present method of operation the Public Service Commission approved these rates between the Appellant and the Appellee.

The Appellee in combination with several member REMCs organized the Hoosier Cooperative Energy, Inc., as a not-for-profit corporation in 1949, as the vehicle proposed for generating such electrical energy.

Several studies were made concerning the feasibility of a generation program. None of these studies advanced beyond the planning stage until June of 1961, when the REA (an administrative agency of the United States) approved a loan to Hoosier Cooperative Energy, Inc., for the construction of a generation and transmission system.

The evidence reveals that Hoosier Cooperative Energy, Inc., intended to obtain Public Service Commission authorization of such proposed generation and transmission, and then construct a generating plant near Petersburg, Indiana, for the transmission of electricity to some sixteen (16) local REMCs, and other customers.

On December 18, 1961, Hoosier Cooperative Energy, Inc., properly filed with the Public Service Commission, as provided by the Public Service Commission Act, its petition for a certificate of convenience and necessity to construct, maintain and operate a generating station and transmission system.

Several public utilities, including the Appellant, intervened and opposed the project as being unnecessary, un-

economical, and not in the public interest. Thereafter, it appears that arrangements were made to transfer the REA loan from Hoosier Cooperative Energy, Inc., to the Appellee. On April 25, 1962, Hoosier Cooperative Energy, Inc. dismissed its petition before the Commission.

For the purposes of this appeal there are two issues for this Court to determine. The first is whether the Appellee has the authority to engage in the generation and transmission of electric energy, and the second question concerns the legal effect of non-user. If one assumes that the Appellee did possess the right, power and authority to proceed with its plans as a result of a privilege which was granted in 1935, the question then arises as to whether the Appellee possesses such a right today, after failing for a period of thirty years to generate and transmit electric energy.

In order to decide the issues in this appeal, it is necessary to review the entire REMC Act. In so doing, we are of the opinion that REMCs have the corporate power, under the REMC Act after approval by the Public Service Commission, to generate and transmit electricity. This corporate power is provided for in the REMC Act (Burns' Indiana Statutes Anno. § 55-4411, 1951 Repl.).

Upon obtaining a determination of convenience and necessity from the Public Service Commission at the time of the incorporation, as provided by Burns' Indiana Statutes Anno. § 55-4405, a REMC may also obtain a public utility right to engage in the utility operations of generating and transmitting electricity in certain authorized territory. But it appears such territory, as originally stated in the articles of incorporation of a REMC may not, under the provisions of Burns' Indiana Statutes Anno. § 55-4404 (B), include any territory ". . . already being served with energy by any public or municipally owned utility . . . ;" and it appears that an REMC's territory may not later be extended or enlarged without a determination of convenience and necessity by the Public

Service Commission under the provisions of Burns' Indiana Statutes Anno. § 55-4420.

Further, we are of the opinion that a REMC does not have the right to cross or use county roads or property for the generation or transmission of electricity in any county where it has not previously done so, and where another public utility is already supplying similar service, without applying for, and obtaining a determination of convenience and necessity from the Public Service Commission as required by Burns' Indiana Statutes, Anno. § 26-620 (5) and § 55-4411 (f) for the particular service which the REMC proposes to supply. We are unable to find in the record now before us, any evidence that Indiana Statewide R.E.C. Inc., has ever sought or obtained such a determination which the legislature saw fit to make mandatory for REMCs (as required of the other public utilities) by the amendment of Burns' Ind. Stat. Anno. § 55-4411 (f) in 1937.

In reviewing the record, we fail to find, nor has anyone pointed out to us in the argument of this cause, whether Appellee Indiana Statewide R.E.C., Inc., has had any proceedings before the Public Service Commission, seeking a determination of convenience and necessity since the 1937 enactment. We assume, therefore, that Appellee has never sought or obtained the administrative determination which the applicable law requires before it can undertake its proposed services.

The record shows that in 1935, Indiana Statewide R.E.C., Inc., obtained the utility right to generate and transmit electricity, but that is not the real issue before the Court at this time. The real question before the Court is whether Appellee has the legal right to do so now, for the first time, without now obtaining a determination of public convenience and necessity from the Public Service Commission.

The Appellee Indiana Statewide R.E.C., Inc., has never heretofore generated or transmitted electricity or otherwise

acted as a *public utility* (our emphasis). Our Supreme Court has held that cooperatives which are organized and operated pursuant to the REMC Act are *public utilities*. The following statement appears in the case of *Kosciusko County Rural Elect. Membership Corp. et al.* v. *Public Service Commission, et al.* (1948), 225 Ind. 666, 77 N. E. 2d 572, at page 678:

". . . In our opinion the entire purport of the Rural Electric Membership Corporation Act leads to the conclusion that it was for the purpose of affording a means of creating a public utility corporation such as REMC to engage in the electrical energy business, and, as it provides, to encourage the 'fullest possible use of electric energy' in its territory . . ." ". . . We think the better reasoning is, and *so hold, that REMC and all like corporations are public utilities*" (our emphasis).

An examination of the authorities reveals that under the law of this state and many other states, the right to operate any public utility is granted by the state upon the conditions of convenience and necessity, and that such authorized right must render a valuable and needed service to the interested public. We are of the opinion that if the conditional right to operate a public utility for the convenience and necessity of the public is not used to fulfill such needed public service within a reasonable time, the right automatically lapses. Equitably, this should be the rule, especially if another public utility (as was the case in this instance as shown by the record) has in the meantime expended its capital in order to meet the needs of the public for such services.

The undisputed evidence in the record now before us discloses that for more than thirty years Appellee Indiana Statewide R.E.C., Inc., has not generated or transmitted electricity, although it claims that it received a determination of convenience and necessity from the Public Service Commission in 1935 as provided for by the REMC Act. It is also undisputed that the Appellant provided and is now providing such service to the public through Appellee at rates approved by the Public Service Commission.

Therefore, it is our opinion, based on the law as heretofore determined by our Supreme Court, that any rights which Appellee Indiana Statewide R.E.C., Inc., obtained from the Public Service Commission in 1935 as a public utility to generate and transmit electricity, have lapsed through its failure to render such services to the public within a reasonable time after receiving a favorable determination. To hold otherwise, would contravene the ruling precedents of our Supreme Court. See *Public Service Co. of Ind.* v. *City of Newcastle, et al.* (1937), 212 Ind. 229, 8 N. E. 2d 821.

In the *Newcastle* case cited above, on page 240, 8 N. E. 2d 826, we find the following statement:

". . . indicated a desire to maintain a technical status—to preserve whatever legal rights the city might have had rather than a present intention to dedicate its plant, if it then had a plant adapted to serve the public, to a public use. A franchise or right to serve the public as a public utility is contingent upon use, and, may lapse or be forfeited by non-user."

Our Supreme Court in the case of *City of Huntington, et al.* v. *Northern Indiana Power Company* (1937), 211 Ind. 502, at page 514, 5 N. E. 2d 889, at page 894, stated in part:

"That service had been furnished by Appellee and its predecessors for many years prior to that date, and under an indeterminate permit continuously since 1923. Section 98 of the 1913 Act provides that no municipality shall construct a plant or any equipment where there is in such municipality a public utility engaged in a similar service under an indeterminate permit without first securing from the commission a declaration of public convenience and necessity.

"Appellants rely upon the fact that in 1914 the city was granted permission to distribute electricity for domestic and commercial purposes. However, this authority was never exercised. The city will not be permitted to hold such right in a dormant state, and, after a public utility has operated under legal authority for many years and expended large sums to serve the public, undertake to operate under the condition here presented.

"Having in mind the well settled rule in this state that a city, in distributing electricity, acts in either of two capacities: (1) Governmental, when furnishing electric energy to light its streets and public buildings, or (2) as a private corporation when selling such energy for domestic and commercial purposes (*City of Logansport* v. *Public Service Commission, supra*), what is the legal status of the city of Huntington in its claim to the right to serve the public under its permit of 1914? It is not aided by the fact that it furnished electricity upon two isolated occasions to the CCC Camp and for an entertainment hall, for which it received a small remuneration.

"The question as to the relative rights of private corporations to use the streets for the installation of wires for telegraphic and telephone service is discussed by the United State Supreme Court in the case of *New York Electric Lines Co.* v. *Empire City Subway* (1914), 235 U.S. 179, 35 S. Ct. R. 72, 76, 59 Law Ed. 184. The facts in that case disclose that the appellant was granted the first franchise to occupy the streets of that city. It failed and neglected to complete its preliminary work in order to serve the public. After some years another franchise was granted to the appellee, which installed the equipment and served the public. Thereupon the appellant brought the action to enforce its right under its earlier franchise. The court held that it had lost such right by non-user. It was held that the appellant's grant became effective when made and accepted and protected it in starting the enterprise to render service for public benefit; that the failure to so exercise it as contemplated was ground for revocation or withdrawal, although there was no express authority for such revocation reserved in the franchise. The court stated 35 S. Ct. p. 76: p. 194

'And when it is said that there is vested an *indefeasible* interest, easement, or contract right, it is plainly meant to refer to a franchise not only granted but exercised in conformity with the grant. It is a tacit condition annexed to grants of franchises that they may be lost by mis-user or non-user. (Citing authorities) The condition thus implied is, or (sic) course, a condition subsequent. The same principle is applicable when a municipality under legislative authority gives the permission which brings the franchise into being; there is necessarily implied the condition of user. The conception of the permission as giving rise to a right of property in no way involves the notion that the exercise of the franchise may be held in abeyance for an indefinite time ... Although the franchise

is property, "it is subject to defeasance or forfeiture by failure to exercise it".'

"See McQuillin, Municipal Corporations, Vol. 4 (2nd), sections 1795, 1796, 1797, 1798 and annotations. The rule there announced and supported by abundant authority amounts to saying that when the Public Service Commission of Indiana, in 1914, granted to the city of Huntington authority to engage in domestic and commercial lighting, it must use that grant for public benefit. It was granted upon the implied condition that it would be so used. The non-user for more than twenty years amounted to a forfeiture. Also see *Capital City Light & Fuel Co.* v. *Tallahassee* (1902), 186 U.S. 401, 411, 22 S. Ct. R. 866; *Kavanaugh* v. *St. Louis* (1909), 220 Mo. 496, 119 S.W. 552; *State ex rel* v. *East Fifth Railway Co.* (1897), 140 Mo. 539, 41 S.W. 955, 38 L.R.A. 218, 620 Am. St. Rep. 742; *Louisville Trust Co.* v. *Cincinnati* (1896), 76 Fed. 296, 22 C.C.A. 334; *Security Trust Co.* v. *Grosse Pointe* (1929), 32 Fed. (2d) 706; *Cawker* v. *Meyer* (1911) 147 Wis 320, 133 N. W. 157, 37 L.R.A. (NS) 510; *Allen* v. *Railroad Commission* (1918), 179 Cal 68, 175 Pac. 466, 8 A. L. R. 249."

Therefore under the foregoing decision, we are of the opinion that the rights, if any, which the Indiana Statewide R.E.C., Inc., had to generate and transmit electricity as a public utility have lapsed through non-user and such non-user amounts to a forfeiture of such right.

What has been stated herein should not be construed to mean that Indiana Statewide R.E.C., Inc., may never generate or transmit electricity.

The Appellee herein devotes a substantial portion of its argument to this question of lapse through non-user. Its argument is broken down into three subdivisions as follows:

"A.  A Statutory, Corporate Power is Not Lost in the Same Way as a Franchise Right Granted by a Regulatory Body;

"B.  Even if a Statutory, Corporate Power Can be Lost by Nonuser it Could Not Be Declared Forfeited Unless It is Proved That the Holder of the Power Intended to Abandon It;

"C. By Its General Finding for Appellee, the Trial Court Found as a Fact That Appellee Had Not Lost Its Power to Generate and Transmit Electricity."

We shall examine the above propositions in the order of their appearance.

The crux of the Appellee's argument under Point A above, is that the *Newcastle* and *Huntington* cases, *supra*, are not applicable, because neither involved a specific corporate power conferred by statute. Appellee further states:

"It is implicit in the reasoning in the *Huntington* case, that a permit from the Public Service Commission carries with it a finding by the Commission that a need for the exercise of the rights granted under the permit exists at the time of the grant of the permit. That is the reason the order of the Commission is called a 'Certificate of Public Convenience and Necessity.' A failure to render the service authorized by the permit may result in injury to the public and therefore the power may be lost by nonuser. That is not true of a specific legislative grant of power such as is formed in the REMC Act. These powers may be used in the future when, and if need for their use arises, and no public harm results from failure to exercise all the powers granted. For that reason mere nonuser is not grounds for loss of the statutory power."

We cannot agree with the above statement. The main purpose of the passage of the REMC Act was to provide electricity to rural areas. It seems unrealistic to assume that after a REMC had obtained the power to provide electricity to rural areas, it should be allowed to abandon the privileges granted and let this power lie dormant for a period of thirty years before attempting to revive it.

The legislature in granting powers and privileges is presumed to legislate for the present, not the future. If we were to accept the Appellee's argument, we would have to concede that the legislature's purpose in the passage of the REMC Act, as stated above, could be thwarted. The legislature could be presumed to know that if it passed this Act with the intent that REMCs could obtain the power to generate and transmit

electricity, and then allow such power to remain unused for indefinite periods to be revived at later times at the whim of the REMC, this contingency would cause a public utility to question the wisdom of investing capital to serve the REMCs in the dormant period. Thus, the power companies would not furnish power to the REMCs and the purpose of the legislation would be thwarted.

In respect to the Appellee's argument that there is no injury to the public because this is a specific legislative grant of power, one need look no further than Burns' Anno. Stat. § 55-4405 (1951 Replacement), wherein it is stated:

". . . When so acknowledged the articles of incorporation shall be submitted to the public service commission together with a petition executed by one (1) or more of the natural persons executing the said articles of incorporation praying the commission to grant a certificate of public convenience and necessity for the organization and operation of the proposed corporation . . . The commission, after hearing the evidence introduced at said hearing, shall enter a finding either that the convenience and necessity of the public proposed to be served in the territory in which the operations of the corporation are to be conducted will or will not be served by the organizations and operations of the proposed corporation. If such finding be in the affirmative, the commission shall enter an order approving the organization of such corporation and the proposed articles of incorporation and shall attach a copy of said order to each copy of the said articles of incorporation. If the said finding be in the negative, the commission shall enter an order denying the approval of the said articles of incorporation.

". . . As soon as the provisions of this section have been complied with, the proposed corporation described in the articles so filed, under its designated name, shall be and constitute a body corporate."

It can readily be seen that a REMC must first obtain the approval of the Public Service Commission before it becomes invested with any power flowing from the statute.

We cannot see why, as a matter of law, a REMC should be in a preferred position with respect to the rule of nonuser.

As was pointed out in the case of *People* v. *Broadway R. Co.* (1891), 126 N.Y. 29, 26 N.E. 961, the Court of Appeals of New York stated:

> "The defendant, having accepted the law of 1860, was bound to act under it. It could not accept the franchises given to it, and then leave them in abeyance. They are supposed to have been given, not exclusively for the benefit of the defendant, but also in the interests of the public. It cannot be supposed that the legislature meant to give them without imposing obligations upon the defendant to build its roads until certain streets running out into the country should, in the distant future, be opened, graded, and paved. Why was this act passed in 1860 if it was not intended or supposed that anything was to be done under it for 25 or 50 years? Can it be supposed that the legislature meant to confer these franchises upon the defendant, leaving it optional with it whether it would build its roads in one or fifty years? Such legislation would be against public policy, and such a legislative intent cannot be presumed. It must be supposed that the defendant applied for the franchises, and that the legislature granted them intending that they should be used, at least to some extent, and, so far as practicable, in the near future."

The Appellee contends that the grant of power to the REMCs was in general terms, being broad and varied, because the legislature anticipated that these powers might be exercised in the future as the need might arise.

> "An example of powers granted to such corporations was the power to borrow money and the power of eminent domain. It is obvious that such powers might not be exercised at all until a need arose. The same thing is true of the power to generate and transmit electricity." (Appellee's Brief)

With this statement we cannot agree. There is a distinction to be made between a power to pursue a main objective (i.e. generation and transmission of electricity) and the powers which are necessarily incidental to achieve the main objective. (i.e. eminent domain). This distinction is important in terms of non-user for while the incidental powers may remain dormant for indefinite periods of time until the need for their use

arises, the main power cannot remain dormant but will be forfeited by non-user.

The Appellee's next contention asserts the necessity of an intent on its part to abandon before a lapse because of non-user occurs.

This contention is not the law in Indiana as the law has been stated by the Supreme Court of Indiana in the *Huntington* and *Newcastle* cases, *supra*. All that is necessary to show a lapse through non-user is a lengthy period of time which has elapsed, during which time a need for utility service had arisen which was fulfilled by another utility. This is the circumstance in the case now before us.

The Appellee's final point, concerning the trial court's findings that the Appellee had not lost its power to generate and transmit electricity, is devoted to a recital of evidence showing a lack of intent to abandon. However, since intent is not an element of lapse through non-user, this contention need not be discussed.

Lastly, the Appellee makes the argument that the issue of whether the Appellee has lost the power to generate and transmit electricity may not be presented by the Appellant in this action. The basis of this argument is that if a forfeiture of a corporate right is relied upon, there must have been a judicial declaration of the forfeiture in a direct attack.

However, there is nothing in the record to indicate that this question was ever presented to the trial court for determination. There was no demurrer or motion filed by the Appellee, and it appears that the Appellee is attempting to raise this question for the first time in this appeal. It is a well settled rule that this cannot be done. See: *Hooten et al.* v. *Alt et al.* (1963), 244 Ind. 93, 191 N.E. 2d 13; *Cline, etc.* v. *Webb, et al.* (1960), 130 Ind. App. 300, 164 N. E. 2d, 367. As a result, this presents no question for our determination.

By reason of what has been heretofore stated, we are of the opinion that the trial court should have enjoined the In-

diana Statewide R.E.C., Inc., from generating or transmitting electricity until such time as it obtains a current determination of public convenience and necessity from the Public Service Commission of Indiana as provided for by the REMC Act.

We are of the opinion that reversible error exists in this cause, and are, therefore, of the opinion that the trial court's judgment should be reversed, and that the Appellee should be enjoined from generating or transmitting electricity until it obtains a current certificate of public convenience and necessity from the Public Service Commission of Indiana.

Cook, P. J. and Pfaff, J., concur.

ORDER TRANSFERRING CAUSE TO THE SUPREME
COURT OF INDIANA

It appearing that Judges Bierly, Carson and Prime believe that this cause should be affirmed, and that Judges Cooper, Cook and Pfaff are of the opinion that this cause should be reversed, and that Judges Faulconer and Smith are not participating, and it appearing affirmatively that four Judges of the entire Court do not concur in the result, the Court finds that this cause should be transferred to the Supreme Court of Indiana pursuant to Section 4-209 of Burns' Indiana Statutes Annotated. See also *Indianapolis Horse Patrol, Inc.* v. *Ward* (1966), 138 Ind. App. 368, 217 N. E. 2d 626, 627.

IT IS THEREFORE ORDERED, that this cause be, and the same is hereby transferred to the Supreme Court of Indiana pursuant to Section 4-209, Burns' Indiana Statutes.

SO ORDERED, this 9th day of January, 1968.

Charles W. Cook, Presiding Justice.

NOTE.—Reported in 232 N. E. 2d 899.