PUBLIC SERVICE COMPANY OF INDIANA *v.* CITY NEWCASTLE ET AL.

[No. 26,862. Filed June 9, 1937.]

230

*William P. Evans,* and *Scotten & Henshaw,* for appellant.

*Howard Ellis, Yergin & Yergin, Paul Brown,* and *Chester M. DeWitt,* for appellees.

FANSLER, C. J.—Appellant, a public utility engaged in the business of serving the citizens of the appellee city with electric current for domestic and commercial purposes, brought this action seeking to enjoin the appellee city from engaging in business as a public utility and furnishing electric energy for domestic and commercial purposes. There was a trial, and judgment for appellees.

Error is assigned upon the overruling of a motion for a new trial.

The only error presented involves the sufficiency of the facts, concerning which there is no substantial conflict.

Appellant and its predecessors have been operating continuously as a public utility, serving the citizens of the city of Newcastle, and, at times at least, the city also, since 1893.

In December, 1892, the town of Newcastle entered into a contract for the building of a light plant "to light the streets, alleys and other public grounds of the town of Newcastle." There is no evidence of any resolution

or ordinance concerning the construction of this plant. These is no evidence of any resolution or ordinance of the town board or city council at any time declaring an intention to authorize the officers or employees of said town to engage in business as a public utility. There was never an election upon the question of whether the town or city should engage in business as a public utility, and no certificate of convenience and necessity was ever applied for or procured from the public service commission of Indiana authorizing the city to engage in business as a public utility. Under the contract above referred to, a plant was constructed suitable for the generation of current to operate carbon arc lamps, and the plant was put in operation in April, 1893. The lamps were installed in the streets for street lighting purposes. Prior to the construction of this plant and its going into operation, the city made a contract with, and granted a franchise to, appellant's predecessor to install an incandescent lighting system for furnishing lights to private consumers. At the time the city's arc light system was installed, two carbon arc lamps of the same kind used to light the streets were installed in a store room, one in the entrance of another store room, one in the street in front of a church, one in front of the city building in the street, and one in a position where it would light the public street and the platform of a railroad station. These lights were installed on contract for private payment for service. The two in the store room were removed in July, 1893, as soon as the private utility's operations were started. The one in front of the store room was removed in a few weeks because found unsatisfactory and impracticable. No buildings were lighted and no electric power sold from the street lighting plant after the privately-owned electric plant started operations. No incandescent lighting service was ever furnished from the plant which generated

power for the street lighting system. In 1916, twenty-three years after the street lighting plant was put in operation, the city council passed a resolution directing that a generator be purchased, sufficient in size to furnish lights to light the city's waterworks and light buildings. A second-hand 4 k. w. generator was purchased, was found too small, and a second-hand 6 k. w. generator was substituted at a cost of $90.00. This generator seems to have been powered by a second-hand engine, purchased from an employee of the plant. Soon thereafter, the home of an employee of the city plant, about 400 feet across a vacant lot from the plant, and the home of his next-door neighbor were connected with the generator that was used to furnish incandescent lights for the buildings, and these residences were served over those wires intermittently until 1928, when they were disconnected. There seems to have been no resolution or ordinance adopted by the council authorizing this private service. Upon what authority the residences were connected does not appear. From 1916 on it appears that only one other person asked for energy for domestic or private use from the city's source of supply. This was a commercial plant in the immediate neighborhood. The city's employees informed the applicant that the city had no more capacity to furnish electric energy. It appears that during practically all of the time these two private residences were furnished with current, the city was purchasing current from appellant for the purpose of lighting its buildings.

In 1912, the city entered into a contract with certain railroads, the preamble of which recites that:

"Whereas the main tracks of the said Companies intersect and cross at grade, certain streets in the City of Newcastle, and,

"Whereas it is deemed mutually advantageous to the City and to the said Companies to maintain street lights

at or near the said grade crossing," it was agreed that:

"The said City of Newcastle shall install, maintain and furnish with electric current, electric arc street lights, one at each of the following named grade crossings: ...."

The railroads agreed to pay, "for lights so installed and maintained," $18 per year at certain crossings, and $9 per year at other certain crossings. It is recited in the contract that:

"It is understood and agreed by and between the parties hereto that the said sum of (18.00) dollars per year represents thirty-three and one-third (33⅓) per cent of the actual cost to the said City of Newcastle of installing, equipping, maintaining and lighting each of the said electric arc lights.

"It is further agreed by and between the parties hereto that the said city of Newcastle may, at its option, in the extension of its streets or otherwise, if necessary to public safety, install other and additional similar lights at railway grade crossings and if such lights are so installed before the expiration of this agreement, the said Railroad Companies which may be affected thereby shall pay to said City of Newcastle as their proportion of the cost of installation, maintenance and lighting of said lights the rate of Eighteen (18.00) dollars per year for each light."

There were no other instances in which the city furnished electric energy or service from its plant other than street lighting service.

On April 10, 1916, the city council adopted a resolution as follows: "Be it resolved by the common council of the city of Newcastle, Henry County, Indiana, that the following rates be and the same are hereby adopted as the rates to be charged to consumers in the said city of Newcastle for the sale of electricity for light and power purposes, said electricity to be produced from

the municipal electric and water plant now owned and operated by said City as a municipal water and light plant: . . . ." This is followed by a schedule of rates. The resolution and rates were filed as part of a petition to the Public Service Commission. The commission was asked to approve the rates. Appellant's predecessor asked leave to intervene and file objections to the approval of the rates, upon the ground that the city was not a public utility, and did not engage in the production, transmission, delivery, and furnishing of electric current and energy in said city for domestic and commercial lighting and power, and for the reason that it was without lawful authority to so engage, and if engaged was doing so in violation of the law. There was a hearing before the Public Service Commission, and a written opinion in which it was found that, since October, 1912, the city has furnished, in addition to street lighting, electric lights at the crossings of three railroads in the city with various streets therein, and that, since 1916, it has furnished electric current for two residences near the plant. The Public Service Commission declined to decide whether or not the city was a public utility, and said that if the Interstate Public Service Company is the only utility furnishing electric current, the approval of the rates proposed by the city "would at most be only a harmless act of which said company has no right to complain, since the mere approval of a schedule of rates does not create a corporation a public utility."

In 1928, the city entered into a contract with appellant for the purchase of electric energy from appellant for a period of five years. It then discontinued the generation of current. It was provided that the agreement did not cover current purchased by the city at 110 volts, which was paid for by the city at the published rates of the company for like service. The city expressly agreed

that the current purchased under the contract was to be used for the purposes of the civil city only and was not to be resold. There was a provision that: "It is specifically understood and agreed that neither the City nor the Company shall waive any rights that either may have to manufacture and sell electric current for distributing and consumption within the corporate limits of said city." After this contract was signed, the 6 k. w. generator that had been used to light the city's waterworks and lightplant buildings and the two residences was discontinued. It will be noted that 110-volt current had been previously furnished by appellant for the lighting of these buildings. After 1928 no lighting service or current was furnished to any one for any purpose except to light the city streets, and to light the railroad crossings under the contract above referred to, and all electric energy for those purposes was purchased from appellant. In 1932 the city discontinued purchasing electric energy from appellant and procured it from another source. On May 15, 1933, the following proceedings were had by the common council, as shown by the council records: "Councilman Burris moves that the City proceed at once to get estimates on additional buildings and additional machinery to take care of the sale of the municipal electric current for residential or commercial use. Seconded by Councilman Bitler. Motion carried and unanimous vote." It appears that, without any further action by the city council, the city purchased material and began constructing lines with which to serve customers for domestic and commercial purposes. At the time of the trial the city was serving forty-nine customers, who were served by appellant immediately before. During the six months immediately before these customers left appellant's lines they paid appellant approximately $2,850 for service. The city was continuing to extend its operations and to extend its

lines with a view to selling energy and service to the community as a public utility. No notice was served on appellant of the city's intention to engage in business as a municipal public utility.

It is well settled that, when furnishing electric energy to light its streets, buildings, and public places, the city is exercising a governmental function, but that, when it furnishes and sells energy for domestic and commercial purposes, it acts as a private business corporation, and, in the latter case, it is subject to the rules governing private corporations.

There is no contention that the city ever applied for or received an indeterminate permit from the Public Service Commission, or that the question of operating as a public utility was ever submitted to the voters of the city. There is no evidence that the city council, the legislative governing body of the city, ever adopted a policy of engaging in business as a public utility, or that it ever directly authorized the city officers or employees to do anything more than operate a plant for lighting the streets and public places. At the time the city's arc lamp plant was being constructed, the city council made a franchise contract with appellant's predecessor, authorizing it to establish a plant and furnish electric lighting service for domestic and commercial purposes. Under this contract, the private utility was authorized to install its generators in the city's building, and to use the city's poles for supporting its wires, and the city agreed to sell certain steam power for the operation of the plant, which seems to indicate beyond question that the city authorities then had no intention of engaging in the business of serving the public with electric energy.

The street lighting plant was contracted for in 1892. In 1893 the legislature enacted a statute to enable incorporated towns to own, operate, and control electric light-

ing plants, upon the theory that "there is at present no statute authorizing incorporated towns to own electric light plants." Under the act of 1893, and all legislation thereafter enacted, the policy of engaging in the electric business was required to be submitted to the voters, and it was said in *Indiana Service Corp* v. *Town of Warren* (1934), 206 Ind. 384, 393, 189 N. E. 523, 526, that: "Whether, under the statute, a town may adopt municipal ownership of utilities seems to be a question of policy to be determined by an election."

The arc light service furnished to private consumers in 1893 seemed to be merely experimental and unsatisfactory. It was immediately discontinued, and electricity was not furnished to any private person by the city until 1916.

In dealing with the railroad companies, concerning lights as points where their tracks intersect the public streets, the city functioned governmentally in the first instance at least. Section 55-2020 Burns Ann. St. 1933, section 14556 Baldwin's Ind. St. 1934, is as follows: "The common councils of all cities of this state, not working under a special charter granted by the legislature of the state of Indiana, shall have the power to provide by ordinance or resolution for the security and safety of citizens and other persons from the running of trains through any city by requiring railroad companies running and operating a railroad through any city to keep and maintain lights on all nights that the common council may direct, at the points where the railroad tracks cross a street in any city, and may, in such ordinance or resolution, provide what kind of lights the railroad company shall maintain, and the manner of enforcing the compliance with the said resolution or ordinance by the railroad company, and, for that purpose, shall have power to pass and enforce a penal ordinance: Provided, That no city shall have au-

thority under this act to pass any resolution or ordinance requiring any railroad company to maintain any different kinds of lights than that maintained by said city." Under this statute, railroads can be required to light their crossings only at such times as they are used for the crossing of trains, and at reasonable times before and after such crossing. The contract between the city and the railroad companies must be viewed and construed in the light of this statute, which authorized the city to require the railroad companies to light the crossings for the security and safety of the public. It will be noted that the city had no authority to require lights different in kind from those maintained by the city. The city was lighting the streets generally for the protection of the public, and evidently saw some duty or necessity for lighting the streets in the vicinity of the railroad intersections during all of the time that other portions of the streets were lighted, and at times when the railroads could not be required to light the crossings. Railroads are *quasi* public corporations. They may exercise the right of eminent domain in acquiring right of way, upon the theory that their use is a public use. In requiring that they light their tracks at street intersections, the legislature, and the city acting under legislative authority, exercised the police power and functioned governmentally. The contract recites that mutual advantage was seen in the arrangement for the lights. The city desired that the crossings be lighted at all times. The obligation of the railroad companies was to light for part of the time. Therefore responsibility for lighting the remainder of the time was upon the city. That two lighting systems were unnecessary is obvious. The effect of the contract is that the city will provide all lighting and the railroad companies will pay one-third of the cost. It is as though the city and a private corporation were jointly obligated to maintain a line

fence or other structure, and they contracted that the city should maintain the structure, and the private corporation pay its proportionate share of the cost. It is not such a contract as a public utility makes with a consumer or ratepayer. It cannot be doubted that if the city was operating its electric plant for street lighting only, and with no pretense of serving the public as a public utility, nevertheless it had the legal right to make this contract with the railroad companies, and, in so doing, could not be charged with invading the field of a public utility serving the community.

The service furnished to the two residences from 1916 until 1928 is the only other service that was furnished to private consumers. This was furnished from the small generator, the purchase of which was authorized by resolution of the common council, which expressly provided that the generator was for the purpose of furnishing light to the city's buildings. It was inadequate to furnish continuous and adequate lighting for these buildings. The filing of a schedule of rates with the Public Service Commission, when the city had not legally adopted the policy of engaging in business as a public utility, either by action of its common council or by authority of a majority of the voters, did not make the city a public utility. This action, and the provision in the contract entered into with appellant in 1928 that the city did not waive any rights it might have to manufacture and sell electric current, indicated a desire to maintain a technical status—to preserve whatever legal rights the city might have had rather than a present intention to dedicate its plant, if it then had a plant adapted to serve the public, to a public use. A franchise or right to serve the public as a public utility is contingent upon use, and may lapse or be forfeited by non-user. *City of Huntington et al.* v. *Northern Ind. Power Co.* (1937), 211 Ind. 502, 5 N. E. (2d) 889. If the

appellee city had the right to engage in business as a public utility in 1893, it abandoned all pretense of so acting, at least until 1916, and, if serving the two residences in question without assuming any obligation to serve any others can be considered serving the public as a public utility, all such effort was again abandoned in 1928, and there was no further effort until just before the beginning of this action.

The furnishing of service to an employee and his neighbor clearly appears to have been only incidental. The small generator, the only equipment ever owned by the city adapted to serve the public, was not purchased or installed for any purpose other than to light the city's own buildings. The employees of the plant, who assumed authority to connect the residences, felt no obligation to furnish service to the only other applicant therefor, and the responsible officers of the city seem to have felt under no obligation to continue the service in 1928. Such incidental service cannot be a sufficient basis for the establishment of the appellee city as a public utility.

The question of whether a plant is a public utility does not necessarily depend upon the number of consumers, if the plant is devoted to all of the members of the public. In *Cawker et al.* v. *Meyer et al.* (1911), 147 Wis. 320, 133 N. W. 157, it appears that appellants built a plant to heat, light, and power their own building. The plant furnished more service than was required, and the surplus was sold to three adjoining neighbors. It was held that the furnishing of service to these neighbors was merely incidental, and that the plant was not a public utility. The case of *Wisconsin, etc., Co.* v. *City of Menasha* (1914), 157 Wis. 1, 14, 145 N. W. 231, 235, is remarkably like the case at bar. The city had constructed a plant and had furnished a few lights to one residence and to a store. It had

ceased to perform even this function as a public utility for more than three years. The court said: "Where a city builds a plant adequate only for the purpose of doing its own lighting, but intends to enter another field of operation in the indefinite future, we do not think it can reasonably be said that, because of such intention, and because a small portion of the equipment in use may also be useful in the new operation, it is in fact engaged in such new operation." In *Ford-Hydro Electric Co.* v. *Town of Aurora* (1932), 206 Wis. 489, 240 N. W. 418, 420, 421, it was held that the corporation owning a power plant, which had legal authority to serve the public as a public utility, but did not serve the public, was not a public utility. It is said that: "The question is whether the plant is built and operated to furnish power to the public generally."

Under the evidence, viewed in the light most favorable to appellees, the conclusion is inevitable that the appellee city's plant was never designed to serve the public generally, and that it was never operated for the purpose of serving the general public, that the service to the two residences was merely incidental, probably as an accommodation, and that the city felt no obligation to furnish this service or to continue it. But even if this incidental service, unauthorized by the responsible officers of the city, could in any way be construed as a dedication of the plant to public service, and if the small generator could in any sense be considered as a plant suitable for devotion to the public service, the status of the appellee city was abandoned in 1928, and at the time of the trial it was not a public utility. *City of Huntington et al.* v. *Northern Ind. Power Co., supra.*

Appellees contend that appellant has been guilty of laches, and that it may not now equitably question the

appellee city's right to furnish service to the public. But it cannot be said that appellee has clearly and unequivocally engaged itself in the business, nor that appellant could be charged with knowledge that it was so engaged. In fact, it is clear that, for five years at least before this action was begun, the city was not so engaged.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.