SOUTHERN INDIANA GAS AND ELECTRIC CO. *v.*
INDIANA STATEWIDE RURAL ELECTRIC COOPERATIVE, INC.

[No. 168S3. Filed December 10, 1968. Rehearing
denied January 22, 1969.]

460

G. R. *Redding, John L. Woolling, Virgil L. Beeler,* Indianapolis, and *Fred P. Bamberger, Bamberger, Foreman, Oswald and Hahn,* Evansville, *Baker and Daniels,* Indianapolis, of counsel, for appellant.

*William H. Wolf,* Greenfield, *Ralph P. Zoercher,* Tell City, *William H. Parr, Jr.,* Lebanon, *Jeremiah L. Cadick, William E. Plane,* Indianapolis, and *Parr, Richey, Obremskey and Pedersen,* Lebanon, *Cadick, Burns, Duck and Neighbours,* Indianapolis, of counsel, for appellee.

LEWIS, C.J.—This case comes to this Court after an appeal to the Appellate Court of Indiana in which that court voted three (3) to affirm and three (3) to reverse, with two (2) judges not participating. 232 N. E. 2d 899. The action was instituted by the appellant seeking injunctive relief, and the prayer of appellant's complaint is substantially as follows:

> "[That appellee be enjoined] . . . from either constructing or operating an electric utility generating plant of transmission facilities; from producing, furnishing, transmitting or selling electricity in any part of the area or to any of the customers, served by the plaintiff; from using or crossing county roads or other county property for the installation of its facilities; and from otherwise engaging as a public utility in the production, transmission, sale or furnishing of electric power, all unless and until authorized so to do by proper order of the Public Service Commission of Indiana, and in the case of using county property, unless and until properly authorized so to do by the respective counties."

The Trial Court denied the injunction, and the appellant assigns as error:

"The Trial Court's denial of its motion for a new trial with the specification of error being that the decision was contrary to law."

The appellee, prior to the filing of this cause of action, had taken steps to construct an electric utility generating plant and transmission system in southern Indiana, and it contemplated selling to a number of local REMCs in order that such local REMCs might sell at retail, electric service in the areas for which they are authorized. At the present time, the local REMCs purchase the electric power from public utilities. Two (2) such REMCs purchase from the appellant.

The appellant generates and sells electric power service, and has done so for a number of years. It serves urban areas as well as rural areas throughout southwestern Indiana. Its customers include retail domestic and farm users, as well as commercial, industrial, and public consumers. The appellant also sells wholesale energy to municipalities as well as the REMCs noted above.

The service to the REMCs had its beginning in 1941 after approval by the Public Service Commission of Indiana (hereinafter referred to as the Commission). The service has been continuous since that time and throughout the intervening years.

Since 1941 appellant has, from time to time, expanded its services and its sales to the REMCs; and, on each occasion, has received the approval of the Commission. This service extended by the appellant to its REMC customers has been adequate, and appellant is in a position to continue such service; and, throughout the years has readily made substantial investments in order to adequately supply service when increases were needed. Part of appellant's investment in plants, and other capital expenditures, has been made for the exclusive purpose of serving the REMC customers. Other of its investments, of course, was made to serve the REMC customers as well as other customers.

The appellee was organized in 1935 under Burns' Indiana Statutes, Anno., § 55-4405 Revised; and, the organization of appellee was approved by Commission as provided by said Act. From 1935 until the institution of this action, the appellee was not engaged in the generation or transmission of electric energy.

The proposed structure of the utility project in question precipitated the case at bar. The record indicates that prior to appellee seeking to build a generating plant without Commission approval, a non-profit corporation known as Hoosier Cooperative Energy, Inc. sought Commission approval for the construction of the generating plant in question. When objections were made before the Commission by appellant and other utilities, this project was abandoned by Hoosier Cooperative Energy, Inc., and the financing proposed to be supplied to Hoosier Cooperative Energy, Inc. was transferred to appellee; and, appellee then sought to carry out the construction and proposed generation and sale of energy without Commission approval.

We, therefore, are met with the question as to whether appellee may carry on this project without a current permissive hearing before the Commission. Appellee contends that it was given permission in its corporate powers in 1935 to do all acts that it proposes now to do, and which appellant seeks to enjoin. Appellee further contends that the fact which is undisputed, that appellee did not take any steps to build a plant or to generate electric power between 1935 and late 1961, does not in any way vitiate any authority that may have been given to appellee in 1935.

The appellant's position is that appellee, in the hearing in 1935, did not propose to the Commission that it contemplated an operation including the generating of power or the transmission and sale of power at wholesale, and that such authority was never contemplated by the approval of the Articles of Incorporation of appellee by Commission in 1935.

Appellant further contends that even though such authority was inadvertently granted, it has now lapsed because of the failure of the appellee to exercise and use such authority in the intervening years and the failure of the appellee to serve any public need during the intervening years.

Appellant further yet contends that the legislative history of the REMC Act, as well as amendments to Commission Acts, points out clearly that the Legislature contemplated that any extension of service by appellee would be subject to the approval of Commission.

The original Indiana REMC Act was passed by the General Assembly in 1935, and pursuant to such Act (Burns', § 55-4405, *supra*,) appellee did file with the Commission its Articles of Incorporation, and asked that the Commission grant a "certificate of public convenience and necessity for the organization and operations" of the proposed corporation. A hearing was had; and, thereafter, the organization of the appellee was completed by approval of its Articles of Incorporation by the Commission and the filing and recording of same.

Appellee argues that at the time of the organization it was given the corporate power to generate and transmit electricity. The REMC Act grants to each REMC the corporate power to generate and transmit electricity; but, the Act also recognizes that there is a fundamental difference between the corporate powers of appellant and other like corporations, and the power of such a corporation to operate and exercise such powers in an industry which is substantially regulated by the Commission. The Act requires each REMC to obtain a determination of convenience and necessity for the operations in which it proposes to engage. Therefore, the burden was placed on the Commission to determine and to make certain that only operations shown to be needed for public convenience and necessity be authorized.

There is included in the record here, the testimony before

the Commission in 1935. At that time appellee did not make any contention that there was any public need for appellee to engage in generating or transmitting electric energy as it now proposes to do. Its agents, officers, and experts, testified that adequate energy was being produced at reasonable prices, and could be purchased at wholesale satisfactorily to meet the needs of local REMCs. The convenience and necessity was shown to be that appellee was called upon to aid local REMCs in providing legal, management, and engineering assistance.

Thereafter, appellee did engage in furnishing, for local REMCs, legal, management, and engineering assistance. This conduct continued for at least twenty-five (25) years after the Commission, in 1935, entered its order approving the Articles of Incorporation of appellee. During all of these years, appellee did not generate or transmit electric energy and it had never operated as a public utility.

Appellee now takes the position that since the verbage concerning generating and transmitting of electric energy was included in its Articles of Incorporation, this power remains. Appellee's position is that by the approval of its Articles of Incorporation, it had pre-empted the right to generate and transmit electric power without any further approval on the part of the Commission even though appellee has failed to use that power or to serve the public under that power in the intervening years.

Appellant argues that the power was never granted in 1935 because all of the evidence indicates the power was not sought. Appellant further argues that even if some naked power had been granted in the Articles of Incorporation, it has long since been extinguished and has lapsed because of the doctrine of non-user.

Under the decisions of this Court, appellant relies upon *City of Huntington* v. *Northern Indiana Power Co.* (1937), 211 Ind. 502, 5 N. E. 2d 889, and *Public Service Co.* v. *City*

*of Newcastle* (1937), 212 Ind. 229, 8 N. E. 2d 821. These two (2) cases concerned electric public utilities which successfully enjoined cities from commencing to render competitive electric utility service after such utilities had furnished such services over a period of time.

In each of the above-cited cases the municipal corporation clearly had the corporate power to operate an electric utility within its corporate limits. In both cases the city claimed a long-standing utility right to engage as a public utility and to provide electric utility service.

This Court held in each case that even assuming the original validity of each city's right to operate, such right had long since lapsed because of non-user under circumstances where the public utilities had provided the facilities, had rendered the service, and had met the public need.

In *City of Huntington* v. *Northern Indiana Power Co., supra,* the City of Huntington asserted its utility right under the "certificate of public convenience and necessity" which had been issued some twenty (20) years prior by the Commission. This Court said:

> "Appellants rely upon the fact that in 1914 the city was granted permission to distribute electricity for domestic and commercial purposes. However, this authority was never exercised. The city will not be permitted to hold such right in a dormant state, and, after a public utility has operated under legal authority for many years and expended large sums to serve the public, undertake to operate under the condition here presented."
>
> ". . . The rule there announced and supported by abundant authority amounts to saying that when the Public Service Commission of Indiana, in 1914, granted to the City of Huntington authority to engage in domestic and commercial lighting, it must use that grant for public benefit. It was granted upon the implied condition that it would be so used. The non-user for more than twenty years amounted to a forfeiture. [Cites omitted]"

In *Public Service Co.* v. *City of Newcastle, supra,* the City of Newcastle claimed the right, under its enabling act which

preceded the enactment, in 1893, of statutory provisions requiring municipal corporations to obtain Commission approval prior to the City engaging in the utility business. This Court, assuming the validity of the right claimed by the City, held that such rights had lasped, stating:

". . . A franchise or right to serve the public as a public utility is contingent upon use, and may lapse or be forfeited by non-user. *City of Huntington et al.* v. *Northern Ind. Power Co.* (1937), 211 Ind. 502, 5 N. E. (2d) 889. If the appellee city had the right to engage in business as a public utility in 1893, it abandoned all pretense of so acting, at least until 1916, and, if serving the two residences in question without assuming any obligation to serve any others can be considered serving the public as a public utility, all such effort was again abandoned in 1928, and there was no further effort until just before the beginning of this action."

Appellee contends that the doctrines announced by this Court in the foregoing cases do not apply. Appellee argues that its rights to operate as an electric utility is granted by statute; that is, that the right is given directly by the Legislature rather than by Commission action, and, therefore, that the right granted by the Legislature is not subject to lapse. [It is interesting to note that the City of Newcastle made this argument, and that this Court denied the argument.]

It is not appellee's corporate power that lapses, but, rather, its claimed right to operate as a utility. Historically, utility rights have been granted by the State. This was true because that was the way utility rights were granted before municipal corporations were empowered to grant franchises and before regulatory commissions were established.

In an analysis of *New York Electric Lines Co.* v. *Empire City Subway Co.* (1914), 235 U. S. 179, 35 S. Ct. 72, which is cited by this Court in *City of Huntington* v. *Northern Ind. Power Co., supra,* it is clearly shown that the Supreme Court of the United States relied upon prior decisions which had applied the doctrine of lapse because of non-user to utility rights obtained directly from the Legislature.

Appellee seeks to distinguish its position from the above two (2) cases cited by appellant, contending that the municipal corporations operate as private corporations when in the utility business; but, appellant properly answers that the appellee is also a private corporation itself and can act only as such.

Appellee further contends that on the record, lapse for non-user should not apply because there is a failure of evidence that appellee intended to abandon its right to generate and transmit power. *Public Service Co.* v. *City of Newcastle, supra,* held to the contrary. In that case the Trial Court specifically found that the City did not intend an abandonment; and, the Trial Court, based upon that lack of intention, determined that the City had not lost its utility right. This Court, however, reversed, and held that the lapse had occurred as a matter of law where there was a failure to meet a need for service and where another utility provided the service.

In *City of Huntington et al.* v. *Northern Ind. Power Co., supra,* and *Public Service Co.* v. *City of Newcastle, supra,* this Court has held that even though authority may be granted to a utility to render public service, if that utility fails to provide that service and another utility does provide and does render the service and is in a position to meet the public need, the unused right or authority of the first utility lapses and fails to exist.

These decisions are based on important considerations of public policy. The underlying objective is to secure and encourage service to the public. The reason and purpose for granting a right or authority to render a utility service is to meet a public need for service. If the utility holding such grant fails to serve, and the need is met by another utility, the grant does not and should not survive.

It would be completely unconscionable to hold that the service actually being rendered by the utility which has met

the need be displaced in any attempted exercise of the attempted exercise of the old and unused grant. It occurs to us that it is much more fair, practical, and reasonable, to say that a current grant on the basis of current public convenience and necessity is first required.

The precedent of the case law here involved and the principles underlying such case law apply to this case. The rights claimed by the appellee to generate and transmit electricity, and to engage and operate utilities, based on the 1935 Commission hearing and proceedings, have lapsed through non-user. A current hearing and a current grant by the Commission certainly is in order before appellee should be permitted to proceed to generate and transmit electricity.

The law of Indiana has for years recognized the validity of regulating the utility business to the end that we not have duplication of utility facilities and unnecessarily expensive utility service since this would adversely affect the public in receiving efficient and economical service.

Competition between utilities should be permitted only after the Commission finds it in the public interest that such competition should exist. It is from this law that the statutes provide that local governmental units are prohibited from issuing permits to a utility for the use of streets, roads, and places, where another utility is already lawfully serving. This permission should be withheld until the Commission has determined that public convenience and necessity requires competing services. See Burns', § 54-601.

Based upon Burns', § 54-601 (first enacted in 1913), this Court decided *Farmers' & Merchants' Co-op. Tel. Co.* v. *Boswell Tel. Co.* (1918), 187 Ind. 371, 119 N. E. 513. There it was held that the Boswell Telephone Co. was entitled to enjoin the Co-operative Telephone Co. from starting competitive services without the approval of the Commission.

Burns,' § 26-620(5) conditions the issuance to utilities of

permits to use or cross roads if another utility is already furnishing the same, or similar, service upon:

". . . the consent of the public service commission first had and obtained after a public hearing of all parties interested and the determination by such public service commission that public necessity and convenience require that such applicant engage in the production, transmission, delivery, distribution, supplying, furnishing, or sale of such same or substantially similar commodity or service. . . ."

The REMC Act, as adopted in 1935, restricted competitive service between REMCs and other utilities by forbidding the REMC to be organized to render service in any territory already being serviced. Burns,' § 55-4404(b). REMCs were, therefore, at that time, permitted to cross and use public ways "without obtaining any franchise or permit therefor." Acts of 1935, ch. 175, § 11(f); but, of course, the restriction against competition with any other REMC, or any other utility, explains the Legislative intent with regard to this freedom for a REMC to use or cross public ways.

In the year 1937, the REMC Act was amended providing that REMC could use and cross public ways "after obtaining the necessary franchise or permit therefor." Burns', § 26-620(5), provides that the permission to use or cross public ways can only be obtained after a determination of public convenience and necessity by the Commission.

We believe, therefore, that by 1937, the Legislature had made certain amendments to be quite certain that REMCs would be treated as other utilities as far as obtaining Commission approval for its extentions as a condition precedent to obtaining permits to use or cross public ways.

The appellee has contended that it is not required to seek Commission approval and determination under Burns,' § 26-620(5), *supra,* because appellant is not serving under an indeterminate permit. We believe the appellee's position is in error.

Appellant does serve customers in rural areas in the counties involved under Commission "certificates of convenience and necessity." These certificates are indeterminate permits as defined in Burns', § 54-105.

Appellant serves the REMCs involved under contracts which have been filed with and approved by the Commission. These contracts are subject to the jurisdiction of the Commission and to powers to regulate. *State ex rel. Public Service Commission* v. *Boone Circuit Court* (1956), 236 Ind. 202, 138 N. E. 2d 4. Appellant received Commission approval before it instituted the service in question and this approval does, as it rightfully should, give the appellant the right or privilege lawfully to render its service to its REMC customers.

We believe that under the definition contained in Burns', § 54-105, *supra,* each such right or privilege is an indeterminate permit. *Boone County Rural Elec. Membership Corp.* v. *Public Service Commission* (1959), 239 Ind. 525, 159 N. E. 2d 121, held that "supplying electricity to other utilities for resale to the public is a public utility service." The Legislature has recognized that utility service to the public should be protected from the adverse consequences of competition unless such competition is found by the Commission to be needed in the public interest. Burns', § 26-620 (5), *supra.*

Appellee relies heavily on *Alabama Power Co.* v. *Ickes,* (1938), 302 U. S. 464, 58 S.Ct. 300, and *Rural Electrification Admin.* v. *Central Louisiana Elec. Co.* (5th Cir. 1966), 354 F. 2d 859, and certain other related cases, for authority that the appellant does not have standing to enjoin appellee.

We do not believe that the cases cited sustain appellee's position. An analysis of the cases cited, and the related cases, indicates to us that these cases were differentiated in the following ways: *First.* These cases were against a federal officer or his agency and sought to enjoin the expenditure of federal funds. The case at bar is between private corporations. The

*second* difference that should be noted is that in the cases cited by appellee, the utility operation proposed in each instance was either authorized by the State or the State law did not require authorization. In *Rural Electrification Admin.* v. *Central Louisiana Elec. Co., supra,* the court noted that Louisiana did not regulate competitive utility service, but permitted the parties "to fight it out, unpoliced, among themselves."

There is a vast difference between the case that arises under State law that does not require regulatory authorization for competing or duplicating utility service and the State of Indiana where authorization is required. Injunctive relief is available in Indiana where State law does require such authorization. Such injunctive relief is available, however, only until such time as the Commission approves a competitive situation by issuing a "certificate of convenience and necessity." *Farmers' & Merchants' Co-op. Tel. Co.* v. *Boswell Tel. Co., supra. City of Huntington* v. *Northern Indiana Power Co., supra. Public Service Co.* v. *City of Newcastle, supra.*

We do here hold that appellee may not generate or transmit electricity until it has obtained the requisite Commission approval and the approval of the various county bodies. We hold that appellee is attempting to proceed without public authorization. It does have the capacity as a corporation to generate and transmit electricity, but this power alone does not relieve appellee from regulations respecting those operations nor does this supply the needed regulatory approval in order to engage in them.

Duplication by REMC or appellee here of utility service may not be in the public interest, and a determination of what is in the public interest in this respect is solely for the Commission to make, subject, of course, to review by the courts. It is not left solely to the parties as was observed concerning the State of Louisiana in *Rural Electrification Admin.* v. *Central Louisiana Elec. Co., supra.*

We hold that the Trial Court committed error and that this cause be reversed; and, that appellee should be enjoined from generating or transmitting electricity until it obtains a current "certificate of public convenience and necessity" from the Public Service Commission of Indiana; and the trial Court is directed to enter judgment accordingly.

Arterburn and Jackson, JJ., concur; DeBruler, J., dissents with opinion; Hunter, J., dissents with opinion.

## DISSENTING OPINION.

DeBruler, J.—I dissent to the majority opinion because I feel it is the result of an erroneous classification of the nature and the legal status of the parties and the permits and/or franchises involved. The majority opinion also misinterprets and misapplies the provisions of the Public Service Commission Act, the Rural Electric Membership Corporation Act, and relevant case law.

To demonstrate initially the proper function of this court of review in this case I note that "it is only where the evidence is without conflict and can lead to but one conclusion, and the trial court has reached an opposite conclusion, that the decision of the trial court will be set aside on the ground that it is contrary to law." *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 532, 104 N. E. 2d 669, 673; *Board of Zoning Appeals of Town of Carmel* v. *Parsons* (1964), 136 Ind. App. 520, 202 N. E. 2d 589; *Hinds, Executor etc.* v. *McNair, et al.* (1956), 235 Ind. 34, 129 N. E. 2d 553.

Stated in another manner, "[T]he phrase 'contrary to law,' as used in the statute pertaining to the grounds for a new trial, means contrary to the principles of law applicable to the particular case." *Clark* v. *Corbly* (1952), 123 Ind. App. 438, 441, 110 N. E. 2d 309; *Gaines* v. *Taylor* (1933), 96 Ind. App. 378, 185 N. E. 297.

I do not find nor do the parties point out any significant conflict in the evidence presented. It is now therefore our

further function to determine whether or not, given these facts, and the applicable statutes and principles of law, the proper result was reached by the trial judge.

Because of the complexity of this action and in order to define and fix firmly the issues therein, I set out statements of the issues of the parties as set forth in their briefs.

The appellant in its brief states that the issues raised for decision by this court are as follows:

"The basic issue in this case was whether the defendant, before it commences generating and transmitting electricity as a public utility to customers already being furnished such service by the plaintiff, will have to obtain a determination by the Commission that such proposed operations are in the public interest. The consideration of that basic issue involved three other issues:

(a) Did the defendant get the right to generate, transmit and sell electricity in the 1935 Commission proceeding?

(b) If it did, has the right been lost through non-user?

(c) Are the interests of the plaintiff and the damages which it would sustain if the defendant is allowed to proceed, sufficient to permit the plaintiff to obtain an injunction?"

The appellee responds in its brief that the issues were as follows:

"Appellee does not accept appellant's statement of what the issues were and suggests the following as a correct statement of what the issues of law and fact were in the trial court.

1. Did appellee receive the right to generate and transmit electric energy and sell it to its members under the REMC Act, Ind. Anno. Stat. §§ 55-4401 to 55-4426 (Burns' 1951 and Supp. 1964), upon the approval of its articles of incorporation by the Commission, the filing of the articles together with a copy of the order of the Commission in the office of the Secretary of State and the filing of a copy with the approval of the Secretary of State endorsed thereon in the office of the Recorder of each county where a portion of the territory proposed to be served by appellee was located?

2. Did appellee lose its statutory, corporate right to generate and transmit electric energy by nonuser?

3. Whether or not the right obtained by appellee was lost through nonuser or otherwise, is appellant a proper party to bring an action asserting such loss?"

An examination of the uncontradicted evidence reveals the following facts concerning the corporate entities involved in this case. The appellant was incorporated originally on the 10th day of June, 1912. It presently is organized and exists pursuant to the Indiana General Corporation Act and functions as a public utility. The appellant has the normal corporate structure consisting of directors, stockholders, etc., and is a public utility as defined in Burns' Ind. Stat. Anno. § 54-105, and subject to the regulation of the Public Service Commission. The appellant has provided all forms of electric service to all types of customers pursuant to certificate of convenience and necessity and order of the Public Service Commission of Indiana in parts of Dubois, Gibson, Pike, Posey, Spencer, Vanderburgh and Warrick Counties in the State of Indiana since the grant by the commission in 1937. Prior to that time the appellant also engaged in operation as a public utility. In addition to this general distribution area, the appellant provided electricity to several municipalities outside its distribution area and also provided electricity on a wholesale basis to the Southern REMC and Dubois REMC, also outside its distribution area. The appellant purchases electrical energy from at least one other public utility where it can do so profitably. Other utilities generate energy in the area granted to appellant as its distribution area.

The appellee, Indiana Statewide Rural Electric Cooperative, Inc. was formed in 1935 pursuant to the provisions of the REMC Act as a general district corporation. Its articles of incorporation were approved by the Public Service Commission in 1935 and it was granted a certificate of convenience and necessity and an order, authorizing it to operate in all counties of the state in rural areas not then being provided

with electric service. This is the only authorization granted appellee by the Public Service Commission. Since its creation, appellee has assisted in the organization of the local district REMC's in the state and has provided local REMC's with assistance in supply, procurement, accounting and engineering advice, has helped in connection with legislative and publicity programs and tax matters, and has assisted local REMC's in bargaining with public utilities for wholesale power. Appellee has never owned nor operated any plant or property to generate, transmit or sell electric energy.

Under the articles of incorporation of appellee, local district rural electric membership corporations may apply for membership on behalf of their members and thereby become a member of the appellee.

The Dubois REMC was formed as a local district corporation under provisions of the REMC Act in 1939. The appellant has provided it electric utility service continuously since 1954. The Dubois REMC articles of incorporation were approved by the Public Service Commission and it was issued a certificate of convenience and necessity and order authorizing it to operate in rural areas of Dubois and Crawford counties. It commenced sale and distribution of electric energy in 1941. From 1947 to 1954, the electric energy distributed by Dubois REMC was purchased by it from the City of Jasper, Indiana, and from Public Service Company. Since 1954, Dubois REMC has purchased its electric energy from Public Service Company of Indiana and the appellant, pursuant to contract. At no time since its formation has Dubois REMC generated electrical energy.

The Southern REMC was also organized in 1939 as a local district corporation under the REMC Act. Its articles of incorporation were approved by the Public Service Commission and it received a certificate of convenience and necessity and order granting it a distribution area in rural Indiana in Spencer and Posey counties and some areas to the east. Since its formation, this REMC has purchased electric energy at

wholesale from the appellant. The appellant first sold electricity to Southern REMC in 1941, pursuant to contracts between appellant and said REMC. These contracts between appellant and Southern REMC were approved by the Public Service Commission and set the terms for purchase and sale of electricity, including purchase price or rates, service to be furnished, payments, liability of REMC for distribution system maintenance and operation, subject to approval of Public Service Commission. The contracts between appellant and Southern REMC were for a determinate term of five (5) years with provision for extension of twelve (12) months upon failure of either to give notice of intention to terminate agreement.

The Southern REMC distributed the electrical energy through its own system to the ultimate consumers in its distribution area. It has never generated electric energy and has always purchased its electric energy from appellant and from no other company.

Having examined the status of the parties it is now necessary to determine whether or not appellee received authority in 1935 to generate electricity in the manner it now proposes.

In 1935 the appellee submitted its articles of incorporation to the Public Service Commission in accordance with the procedure set forth in Burns' Ind. Stat. Anno. § 55-4405, namely:

". . . When so acknowledged the articles of incorporation shall be submitted to the public service commission together with a petition executed by one or more of the natural persons executing the said articles of incorporation praying the commission to grant a certificate of public convenience and necessity for the organization and operations of the proposed corporation. . . ."

A hearing was duly held by the Public Service Commission on said articles and petition, which hearing was attended by representatives of the appellant. This hearing was held pursuant to the statutory command in Burns' Ind. Stat. Anno. § 55-4405, reading in part as follows:

". . . Upon the filing of such articles and petition with the public service commission said commission shall set the said petition for public hearing. . . . The commission after hearing the evidence introduced at said hearing, shall enter a finding either that the convenience and necessity of the public proposed to be served in the territory in which the operations of the corporation are to be conducted will or will not be served by the organizations and operations of the proposed corporation. If such finding be in the affirmative the commission shall enter an order approving the organization of such corporation and the proposed articles of incorporation shall attach a copy of said order to each copy of the said articles of incorporation. If the said finding be in the negative, the commission shall enter an order denying the approval of the said articles of incorporation. . . .

"If the public service commission approve the said articles of incorporation as hereinabove provided, the same shall be filed together with the attached copy of the order of the commission in the office of the secretary of state who shall forthwith indorse his approval thereon and file one of said copies in his office and deliver all other copies thereof with his approval indorsed thereon to the incorporators who shall thereupon file one of the said approved copies of said articles in the office of the county recorder in each county in which a portion of the territory proposed to be served by the corporation is located. As soon as the provisions of this section have been complied with, the proposed corporation described in the articles so filed under its designated name, shall be and constitute a corporate body."

The articles of incorporation of the appellee were approved by order of the Public Service Commission and the order of said commission together with the articles of incorporation and the approval of the secretary were filed in each county in Indiana.

The order approving the appellee's articles of incorporation reads in part as follows:

"IT IS THEREFORE ORDERED, BY THE PUBLIC SERVICE COMMISSION that the organization of the Indiana Statewide Rural Electric Membership Corporation and the proposed Articles of Incorporation be, and the same are hereby approved, which said proposed Articles of Incorporation are in words and figures as follows, to wit: . . ."

Article II of the said articles of incorporation reads as follows:

"This Corporation shall be a general district corporation, whose operations are to be conducted in all the territory of each of the counties of the State of Indiana named below which territory in each said county is outside of any incorporated city or town; and not including any territory already being served with energy by any public or municipally-owned utility. The counties in the State of Indiana which contain parts of said territory are the following: (here follows a list of all counties in Indiana)"

The purposes of the new corporation were set forth in Article IX of said articles of incorporation and appear as follows:

"The purposes of this corporation are to render service to its members but not for the purpose of pecuniary profit; and for the purpose of promoting and encouraging the fullest possible use of electric energy in the State of Indiana by making electric energy available to the inhabitants of rural areas of the State at the lowest cost consistent with sound economy and prudent management of the business of the Corporation. The Corporation, directly or through member local district rural electric membership corporations shall render reasonably adequate facilities to its members and to such applicants for membership and service as are lawfully entitled thereto, upon their being received into membership in accordance with law, these Articles of Incorporation and the by-laws."

General and specific powers granted to appellee appear in Burns' Ind. Stat. Anno. § 55-4411 in part as follows:

"A corporation created under the provisions of this act shall have power to do any and all acts or things necessary or convenient for carrying out the purpose for which it was formed, including, but not limited to:

. . .

(c) To acquire, hold and dispose of property, real and personal, tangible or intangible, or interest therein and to pay therefor in cash or on credit, and to secure and procure payment of all or any part of the purchase price thereof on such terms and conditions as the board shall determine.

(d) To acquire, own, operate, maintain and improve a system or systems.

. . .

(h) To make any and all contracts necessary and/or convenient for the full exercise of the powers in this act granted, including, without limiting the generality of the foregoing, contracts . . . of energy needed by the corporation to supply its members; for the fixing of the rates, fees or charges for services rendered or to be rendered by the corporation subject, however, to the approval of the public service commission as to all such rates, fees or charges for energy in the same manner and to the same extent as is provided by law for the regulation of such rates, fees or charges of public utilities.

The REMC Act in its definitions sections defines "system, energy and service" as follows:

"(d) 'Energy' shall mean and include any and all electric energy no matter how generated or produced.

(e) 'System' shall mean and include any plant, works, system, facilities, or properties together with all parts thereof and appurtenances thereto, used or useful in the generation, production, transmission or distribution of energy.

. . .

(m) 'Service' or 'services' shall mean the furnishing of energy and the rendering of engineering, financial, accounting or educational services incidental to the production, transmission or use of energy, assisting in the establishment and maintenance of better communications between corporations and their members or any of the same."

The REMC Act in § 55-4410 concerning powers and construction of act provides in part as follows:

"Each corporation formed under this act is hereby vested with all powers necessary or requisite for the accomplishment of its corporate purpose and capable of being delegated by the general assembly of the state of Indiana; and no enumeration of particular powers hereby granted shall be construed to impair any general grant of power herein contained nor to limit any such grant to a power or powers of the same class or classes as those so enumerated."

Finally Burns' Ind. Stat. Anno. § 55-4423 provides that:

"This act is to be liberally construed and the enumeration of any object, purpose, power, manner, method or thing shall not be deemed to exclude like or similar objects, purposes, powers, manners, methods or things."

From an examination of Burns' Ind. Stat. Anno. § 55-4405 as set out above and the order of the Public Service Commission approving the articles of incorporation of the appellee it appears that the proceedings before the said commission were regular and in conformity with the statutory provisions. It also appears from the order of the Public Service Commission that it in no way attempted to limit the powers of the appellee and that the Public Service Commission had, in fact, no authority to grant one power and deny another. The function of the commission was to either approve or disapprove the articles of incorporation. It approved them and the order was not appealed.

The appellant contends that certain statements made on behalf of the appellee at the hearing in 1935 clearly manifested its intention never to generate electricity. The record of that hearing shows that the Witness Briggs testified on behalf of the appellee:

". . . I understand the purpose of the proposed general corporation is to give rural Indiana electricity at the lowest possible rate. It will be a state-wide corporation covering the entire state. The general district corporation could purchase electricity for resale to the locals. The utilities in Indiana haven't put their figures down in black and white and we haven't contracted for any. The proposed general corporation has no plans for the construction of a central power plant of any kind that I know about. I don't think it is the intention of the corporation to do that. I understand it is the intention of the corporation to use the utilities to give this service at the lowest rate. The proposed corporation expects to furnish legal services and are now ready, able and willing to do that. We are ready to furnish technical service and engineering service and already have a man hired for that. . . ."

However, at the same hearing, the Witness Mason who was to become president of the proposed corporation testified:

"The Indiana Statewide REMC understands the purpose of the law under which it proposes to organize to be the cooperation of local rural residents organized into local district corporations and cooperating in management, construction, service and power purchases and/or generation and transmission."

It may not be legitimately inferred from this testimony, taken as it is from the voluminous evidence before the commission, and taken in the context of the time in which it was given, that the appellee was relinquishing any of its powers under the REMC Act. As has been noted before, the Public Service Commission had no authority to take away any of the powers of the proposed corporation. The order of the commission requires no interpretation since it is not ambiguous and the legal effect of it is certain. The commission could either approve or disapprove the proposed articles of incorporation. Once the articles of incorporation were approved the appellee became a "body corporate" and had the powers granted in the REMC Act. The appellee could furnish services to the local district corporations which "services" are defined in Burns' Ind. Stat. Anno. § 55-4403 (m) (1964 Supp.) as including the furnishing of energy and the rendering of:

"engineering, financial, accounting or educational services incidental to the production, transmission, or use of energy, assisting in the establishment and maintenance of better communications between corporations and their members, or any of the same."

The trial court did not err in applying the substantive law from the REMC Act or the facts surrounding the 1935 hearing before the Public Service Commission. The trial court was clearly justified in the determination that it must be assumed was made by it; that is that the appellee had been granted the power to generate electricity in 1935. No other result

would follow from the facts in this case and the applicable law.

I, therefore, would hold that the appellee was formed and became a corporate body under the REMC Act with all the rights and powers enumerated in that act, among such rights being the right to own and operate plants, facilities and properties used or useful in the generation and production, transmission and distribution of electrical energy, as provided in Burns' Ind. Stat. Anno. §§ 55-4410 and 55-4411.

In addition to perfunctorily contending that the appellee was not granted the power to generate electricity in 1935, the appellant further argues that legislative policy of this state requires appellee to obtain approval from the Public Service Commission before it may construct its generating plant and thereby offer competition to the appellant.

The appellant directs us to the case of *Farmers' and Merchants' Co-operative Telephone Company* v. *Boswell Telephone Company* (1918), 187 Ind. 371, 119 N. E. 513, to support this proposition. In the *Boswell* case, *supra*, this court affirmed the granting of an injunction against proposed competition by the defendant cooperative with the plaintiff public service utility. In 1913 the defendant, the cooperative telephone company, was incorporated and applied to the city for a franchise to use streets and alleys of the city for its proposed communication system. The city was enjoined from granting a franchise to the defendant cooperative to operate a telephone system. In 1912 the city had granted a franchise to the plaintiff utility to operate a telephone system in the city. In 1913 pursuant to the said act the plaintiff surrendered its franchise and was granted an indeterminate permit to serve the same area. In 1933 the act became known as the Public Service Commission Act.

This act required that the defendant cooperative obtain a declaration of public convenience and necessity and order authorizing it to operate in the city where a public utility was already operating with an indeterminate permit.

The section of the Public Service Commission Act requiring this authorization is contained in Burns' Ind. Stat. Anno. § 54-601, which reads in relevant part as follows:

"No license, permit or franchise shall be granted to any person, copartnership or corporation to own, operate, manage or control any plant or equipment of any public utility in any municipality where there is in operation a public utility engaged in similar service under a license, franchise or permit without first securing from the commission a declaration, after a public hearing, of all parties interested, that public convenience and necessity require such second public utility; . . ."

The *Boswell* case, *supra,* does not support appellant's contention that the appellee in the case on appeal must now petition the Public Service Commission for new authorization to construct its proposed facility, since the appellant here has never received an indeterminate permit from the Public Service Commission to wholesale electricity to the Dubois and Southern REMC's. The right of action of the appellant here is dependent upon its having an indeterminate permit. In addition, in the *Boswell* case, *supra,* it appears that the cooperative defendant had no indeterminate permit and the appellee here has the approval of its articles of incorporation by the commission and a finding that public convenience and necessity will be served by its operation. In the case on appeal the appellee is an REMC organized under the REMC Act with all rights therein enumerated and subject to such regulations as the General Assembly has determined, whereas in the *Boswell* case, *supra,* the defendant was a municipal corporation. The plaintiff in *Boswell, supra,* was entitled to injunctive relief because the cooperative defendant there threatened to operate without receiving the determination by the commission as required by the then Shively-Spencer Act. It must be stressed that the appellee here is not subject to the provision of the Public Utility Act which required the decision in the *Boswell* case, *supra.*

The trial court properly applied the rule of the *Boswell* case, *supra,* to the case on appeal, and in so doing refused injunctive relief to the appellant.

The appellant and the majority cite the case of the *City of Huntington, et al.* v. *Northern Indiana Power Company* (1937), 211 Ind. 502, 5 N. E. 2d 889, to support their next contention that the appellee has lost the right to generate electricity through nonuser and that it must now return to the Public Service Commission for a certificate of convenience and necessity and order authorizing construction of the proposed generating facility. In 1914 the city of Huntington was granted authority by statute to engage in domestic and commercial lighting. More than twenty years then passed before said city made an effort to serve the public. The plaintiff public utility and its predecessors in interest had operated as the sole electric utility in the city for many years under a franchise granted by the city prior to 1923, and in 1923 the plaintiff electric utility surrendered its franchise to the Public Service Commission and received an indeterminate permit to operate in the same area. The plaintiff electric utility continued to operate until 1935, the time of trial, without competition. This court held that the city had lost its right to operate as a public utility in the city since it had failed to exercise that right for more than 20 years. This court, however, stated its rationale for this holding; that the plaintiff electric utility had served the needs of the public in the city under an indeterminate permit granted by the Public Service Commission. The court in the holding expressed its concern that if a utility or city were granted a permit to serve a specified area and failed to do so, injury to the public in the area would result. In the case on appeal there is no evidence that the area which the appellee is authorized to serve has in any way been harmed by the nonuse of its right to generate electricity. In addition there is no evidence that the appellant had a permit of any sort granted by the Public Service Commission to serve the two local district REMC's.

It may be concluded from the evidence presented in the case on appeal that at the time of the *Huntington* case, *supra,* there were many areas of the state, mostly rural, which were receiving no electricity and the whole thrust of the policy of the time was to extend electrical service to all those who were without it. Thus the principle of nonuser supported the need of the time. There is at present no area of the state not having access to electric energy. The principle of the *Huntington* case, *supra,* was a product of the needs of the time and for the above cited reasons, that principle does not support the loss by the appellee of its right to generate electricity.

Further in support of their contention that the appellee has lost the right to generate power under its 1935 grant, the appellant and the majority cite *Public Service Company of Indiana* v. *City of Newcastle et al.* (1937), 212 Ind. 229, 8 N. E. 2d 821. This case is similar to the *Huntington* case, *supra,* in that the defendant in both cases was a municipal corporation and the plaintiff was a public electric utility operating under a franchise or indeterminate permit. In both cases, the court held that the right of the municipality to generate power had been forfeited by nonuse and the public utility which had served the disputed area for many years under a permit or franchise was entitled to be free of competition until the Public Service Commission authorized another utility to operate in its service area. In the case before us now on appeal, the appellant has no franchise or indeterminate permit and the appellee is a corporation existing pursuant to the REMC Act. Therefore, the right protected in the *Newcastle* case, *supra,* is not held by appellant here.

Therefore, the trial court, in finding for the defendant, correctly applied the rule of the *Newcastle* and *Huntington* cases, *supra,* to the undisputed facts of this case.

I would find that appellee was granted the power to generate electricity in 1935 and that this power has not been

lost by nonuser. I would further find that even if, as appellant urges, the appellee were to go to the Public Service Commission, that commission is without authority to grant a certificate of public convenience and necessity for the proposed facility.

In support of this contention, I now turn to the Public Service Commission Law and the REMC Act and related case law, to determine what the regulatory power of the commission is over privately owned public utilities and corporations existing pursuant to the REMC Act.

From the liberal construction section of the act I understand the General Assembly to have instructed any interpreter of the REMC Act to interpret it broadly and with latitude. That rule need not be applied in the case on appeal, since the meaning of the REMC Act and the order of the Public Service Commission are not ambiguous. The only powers which the Public Service Commission has are those granted to it by the General Assembly. This need not be supported by citation as it is well settled. Under the Public Service Commission Act, the Public Service Commission was given extensive power to regulate the activities of public utilities in the public interest. Among those powers are the powers to regulate the issuance of securities of the public utility, the sale, lease, mortgage, encumbrance of properties of public utilities, to regulate rates and the service provided by the public utility, to investigate into its operation, and the power to grant or deny permits or franchises to carry on proposed operations. In 1935 the REMC Act was passed by the General Assembly and provides that the Public Service Commission shall have power at the time of the formation of a corporation to approve or disapprove the articles of incorporation of the proposed corporation. The Public Service Commission therein is also given regulatory powers over the rates charged by REMC's and over the territory to be served by the REMC. No provision of the Public Service Commission Act provides that the REMC shall be subject to the same regulation as a

public utility. The REMC Act provides only that the REMC shall be subject to the same regulation as a public utility in the matter of rates charged for energy and in the matter of distribution area. With the exception of regulatory authority over rates and territories, all powers granted in Burns' Ind. Stat. Anno. § 55-4411 are granted to REMC's by the Act itself and are not subject to the regulatory power of the commission. The appellee correctly points out that in order for the trial court to have found for the plaintiff it would have had to amend the REMC Act, in effect giving power to the commission to regulate generation of electricity by REMC's. This a court obviously has no authority to do. Such an amendment must come from the General Assembly.

The conclusion that I make, that the General Assembly of this state has given only specific and very limited authority to our Public Service Commission over the activities of REMC's, is further supported by an examination of legislation in other states. In Kentucky, for example, in 1950 the Rural Electric Cooperative Corporation Act was amended to give the Kentucky Public Service Commission the same regulatory power over REMC's as it previously could exert only over privately owned public utilities. Baldwin's Revised Statutes Anno. 3d Ed., § 279.10. In Wisconsin a 1937 statute excluded cooperative associations from the definition of public utilities and the public service commission of that state was given no regulating power over the cooperatives. The rights and duties of the cooperatives are defined in Wisconsin by separate legislation, Chapter 196, Wests Wisconsin Stat. Anno. in Illinois, electric cooperatives are excluded from the definition of public utility in the Illinois General Public Utilities law and made subject to a new Electric Supplier Act which gives specific powers to the Illinois Commerce Commission over electric cooperatives. Smith-Hurd Illinois Anno. Stat., Ch. 111 2/3, § 10.3. In Maine the 1954 Cooperative Enabling Act specifically states that cooperatives shall not be deemed to be public utilities and are not therefore

subject to same control by the Maine Public Utilities Commissions as are public utilities. The act goes on to give the Maine Public Utilities Commission specific but limited power to regulate cooperatives. In Idaho mutual non-profit or cooperative gas, electrical, water or telephone corporations or any other public utility organized and operated for service at cost and not for profit are specifically excluded from control by the Idaho Public Utilities Commission by § 61-104 of the Idaho Code.

Although the legislative history in the various states differs, it appears that most states have in the past treated cooperatives in a different manner than public utilities. They are generally regulated less. I discuss the legislative policy of these states to demonstrate that the cooperatives are never regulated in the same manner as public utilities without specific statutory authority. Since the 1930's some states have moved in the direction of greater regulation of cooperatives. It is not a judicial function to now determine in which direction Indiana should move. Whether or not Indiana should move toward more regulation for REMC's, as appellant contends, is a function of the General Assembly.

To further understand the legislative policy of this state in the area of regulation of REMC's, it is necessary to examine the cases of *Kosciusko County Rural Electric Membership Corp. et al.* v. *Public Service Commission et al.* (1948), 225 Ind. 666, 77 N. E. 2d 572; *Boone County REMC* v. *Pub. Serv. Comm. of Ind.* (1959), 239 Ind. 525, 159 N. E. 2d 121; and *Boone County REMC* v. *Pub. Serv. Comm. et al.* (1958), 129 Ind. App. 175, 155 N. E. 2d 149. None of these cases supports the proposition that a REMC is a public utility and thereby subject to the same regulatory power as a privately owned public utility. They stand instead for the propositions that the commission must support its order by findings sufficient to permit appellate review; contracts between REMC and a privately owned public utility for purchase of electricity at wholesale are subject to regulatory power of the commis-

sion, which it surely is under Burns' Ind. Stat. Anno. § 55-4411 (h) ; and finally that the regulatory power of the Public Service Commission over the REMC's is limited to rates and territories.

I therefore conclude after an examination of the statutes and case law concerning the powers of the Public Service Commission that the Public Service Commission has no power or authority to grant a current certificate of convenience and necessity to the appellee authorizing it to construct its proposed generating facility, and that therefore the trial court did not err in finding for the defendant below. It has been demonstrated by the above discussion that appellant's right to relief is dependent in part upon its having an indeterminate permit. Appellant urges that the approval given the contracts between the local district corporations and itself by the Public Service Commission constitutes an indeterminate permit. The appellant urges, and the majority agrees, that this proposition is supported by the definition of "indeterminate permit" contained in Burns' Ind. Stat. Anno. § 54-105. These contracts between the appellant and the two REMC customers were submitted to the commission for approval of the rate schedules contained in them. The contracts had a beginning date and an expiration date. The rights of the appellant were therefore contractual in nature, which rights would expire when the contract terminated. The commission has specific regulatory power over the rates contained in contracts between the two REMC's and the appellant. The right to supply energy to the two REMC's is a right arising out of contract and not a "grant . . . of a power, right, or privilege to own, operate, manage, or control any plant or equipment . . . which shall continue in force until . . . terminated according to law," Burns' Ind. Stat. Anno. § 54-105. An indeterminate permit can not be dependent upon a contract right which would expire with the contract, but is a grant of power by the state operating through its Public Service Commission.

The appellant next contends that Burns' Ind. Stat. Anno. § 26-620 (5) requires the appellee to obtain a certificate of convenience and necessity from the Public Service Commission prior to using county roads and properties in carrying out its proposed system. Such is the case where some utility is already engaged in the production of electricity under a "franchise, license or indeterminate permit" in the area to be served. The appellant, as has heretofore been determined, had none of these rights. Therefore the commissioners in the counties wherein the two REMC's are located have the authority to grant a permit to the appellee to use county property in its proposed system without a current determination by the commission since no public utility is presently engaged in supplying wholesale electricity to the two REMC customers under a franchise, license or indeterminate permit.

Finally, the appellee contends that the appellant has no standing to sue in this case in that the appellant has no right to be free from lawful competition, and the competition proposed by the appellant is lawful in nature. I agree with this contention. Appellee admits that indeterminate permits and franchises and contracts are property and are protectable under the law, but even indeterminate permits do not create exclusive rights. The two REMC customers which will be presumably taken away from the appellant have indicated that they will honor their contracts with the appellant. Therefore, there is no threat posed to appellant's existing contract rights. I would hold that appellant has no standing to sue in this case. This holding would be clearly supported by the case of *Tennessee Electric Power Co.* v. *T.V.A.*, 306 U. S. 118, 83 L. Ed. 543 (1939). In that case eighteen public utilities corporations who generate in Tennessee, Kentucky, Mississippi, Alabama, Georgia, West Virginia, Virginia, North Carolina, and South Carolina brought suit against the TVA to prohibit it from generating power and distributing it in those states. The Supreme Court held that since none of the plaintiff corporations have been granted

exclusive privilege, franchise, license or easement to serve the disputed area, they have no standing to enjoin competition. The court further holds that the plaintiff corporations must have a legal right which has been invaded. None of the charters of the plaintiff utilities or local franchises created a monopoly or rendered competition illegal. In that case it also appeared that none of the plaintiff corporations had certificates of convenience or necessity or similar grants covering their entire operations. In the case on appeal there is no invasion of those areas wherein the appellant is serving customers under indeterminate permits. Therefore, the appellant is not entitled to an injunction against the proposal of the appellee to construct its generating facilities and system and to serve the local district corporations, Southern and Dubois. This conclusion is further supported by the cases of *Alabama Power Company* v. *Ickes*, (1938), 302 U. S. 464, 8 L. Ed. 374, and *R.E.A.* v. *Central Louisiana Electric Company* (1966), CCA 5, 354 F. 2d 859.

In summary, I would hold that the appellee was granted the power to generate electrical energy as it proposes to do and this power is granted by the REMC Act. This power to generate electricity and to carry on connected activities has not been forfeited or lost by the appellee. I would also hold that the Public Service Commission has no power or authority at this time vested in it by the General Assembly to grant a certificate of convenience and necessity to the appellee, authorizing the appellee to generate electricity, as it proposes to do, even if it were requested to do so by the appellee. I would finally hold that since the appellant is not selling electricity to the two REMC customers under a franchise or indeterminate permit, it, therefore, has no right to an injunction to protect it from the lawful competition of the appellee. The judgment of the trial court should be affirmed.

HUNTER, J., concurs with a further statement of dissent.

## CONCURRING IN DISSENT

HUNTER, J.—I concur in the dissenting opinion of Judge DeBruler and offer this further dissenting statement.

I believe the majority opinion fails to apply the rules of statutory construction and the case law in Indiana to the facts in the matter before us and my reasons are as follows:

(1) The majority indulges in judicial legislation by writing into the Public Service Commission statute and REMC Act, jurisdiction which the Commission does not have.

(2) I believe that the majority has failed to apply the ordinary rules that guide our appellate review of trial courts' judgments and in arriving at a reversal has by its judicial action written into both statutes matters that have been intentionally omitted therefrom. By this device the majority has applied non-existent law to the facts of the case.

(3) I believe the majority is guilty of an unwarranted intrusion into the legislative prerogative to determine what the law ought to be.

Therefore for all the reasons stated in the dissenting opinion of Judge DeBruler and the statement herein contained, I would affirm the trial court's judgment.

NOTE.—Reported in 242 N. E. 2d 361.