

FILED

Dec 20 2017, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Paul D. Vink
J. Christopher Janak
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Peter J. Rusthoven
Nicholas K. Kile
Hillary J. Close
Barnes & Thornburg LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

City of Washington, Indiana,

*Appellant-Defendant/Respondent,*

*v.*

Daviess County Rural Water
System, Inc.,

*Appellee-Plaintiff/Petitioner.*

December 20, 2017

Court of Appeals Case No.
14A01-1702-PL-316

Appeal from the Daviess Circuit
Court

The Honorable Gregory A. Smith,
Judge

Trial Court Cause Nos.
14C01-1608-PL-380
14D01-1608-MI-69

**Bradford, Judge.**

# Case Summary

[1] In 1992, Appellant-Defendant/Respondent the City of Washington, Indiana, entered into a contract ("the Contract") to sell water to Appellee-Plaintiff/Petitioner the Daviess County Rural Water System, Inc. ("DCRW"). The Contract provides that "[a]ny increase or decrease in rates shall be based on a demonstrable increase or decrease in the costs of performance hereunder[.]" In 2016, the City passed an ordinance which raised DCRW's rates 57%.

[2] DCRW challenged the rate increase in two lawsuits—one a statutory challenge to rate increases and the other a declaratory judgment action—both lawsuits being based on the contention that the City breached the Contract by raising DCRW's rate without a demonstrable increase in the costs of performance. Following a bench trial, the trial court entered judgment in favor of DCRW and invalidated the entire Ordinance on the basis that its provisions were not severable. The City appeals, contending that the trial court erred in (1) concluding that the City breached the Contract, (2) invalidating the entire Ordinance, and (3) denying its motion to dismiss DCRW's declaratory judgment action. Because we disagree with the City's first and third contentions but agree with the second, we affirm in part and reverse in part.

# Facts and Procedural History

[3] DCRW is a nonprofit water utility that purchases water from the City for resale to business and residential customers in rural Daviess County. DCRW has

approximately 2800 customers and operates 300 miles of lines, three water towers, and three standpipes. On May 11, 1992, the parities executed the Contract, which obligates the City to sell DCRW up to thirty million gallons of water a month. The Contract, *inter alia*, set the initial rate schedule for water purchases and provided for authorized annual rate adjustments, subject to the following provision in Section C.5.: "Any increase or decrease in rates shall be based on a demonstrable increase or decrease in the costs of performance hereunder, but such costs shall not include increased capitalization of the seller's system." Appellant's App. Vol. II p. 40.

[4] Before 2016, the City increased DCRW's rates pursuant to the Contract as part of across-the-board, pro rata rate increases on its customers, at least one of which increases was approved by the Indiana Utility Regulatory Commission and none of which were based on a cost-of-service study. The most recent rate increases prior to 2016 occurred in 2010 and 2012, and the latter increase was based on a report by H.J. Umbaugh & Associates ("Umbaugh") which did not include a cost-of-service study. The 2012 increase was computed based on the City's capital extension and replacement budget. The 2010 and 2012 increases raised rates approximately 42% between them. In 2014, Umbaugh prepared a draft cost-of-service study, which, as in 2012, computed rate increases based on the City's capital improvements budget.

[5] In July of 2016, Umbaugh completed a cost-of-service study ("the COS Study") and recommended an increase in DCRW's rates, which were $1.43 per 100 cubic feet at the time. Unlike the 2012 and 2014 reports, which used a "detailed

extension and replacement" or "capital improvement program" accounting method, the COS Study based its proposed rate increase on using the City's "depreciation expense" to compute the City's revenue requirements and cost of providing service to DCRW. Appellant's App. Vol. II p. 15. The switch to using the depreciation method resulted in an annual increase in the City's revenue requirement of more than $400,000.00.

[6] On August 8, 2016, the City Common Council passed, and the City's mayor approved, Ordinance 12-2016 ("the Ordinance"), which increased the wholesale rate for sale-for-resale customers to $2.25 per 100 cubic feet, which had the effect of increasing DCRW's rates approximately 57%. The Ordinance also increased the rates of individual customers who lived outside the City by 14.8%. The increase implemented by the Ordinance would increase the cost of water purchased by the DCRW by approximately $325,000.00 annually.

[7] On August 12, 2016, pursuant to Indiana Code section 8-1.5-3-8.2,[1] DCRW filed a petition in Daviess Superior Court challenging the Ordinance as it applied to them, alleging that it violated Section C.5. of the Contract. Also on August 12, 2016, DCRW filed a declaratory judgment action in Daviess Circuit Court, seeking to have the Ordinance declared void as applied to DCRW. On

---

[1] This section details the procedures by which "[o]wners of property connected or to be connected to and served by the works authorized under this chapter may file a written petition objecting to the rates and charges of the utility[.]" Ind. Code § 8-1.5-3-8.2(b).

August 22, DCRW moved in Daviess Circuit Court to consolidate the two cases, which motion the trial court granted on August 26, 2016.

[8] On October 26, 2016, the trial court conducted a one-day bench trial. Accountant Steven Brock testified that he had prepared an "Exception Report" to the COS Study for DCRW and that, in his opinion, the COS Study did not propose rate increases for DCRW that were based on a demonstrable increase in the cost of performance. Brock testified that, using the same methodology as was used in 2012, the City's net revenue requirements increased approximately $263,339 from when rates were set in 2012 to 2016, or approximately 5.43%. Kerry Heid also opined that the COS Study did not support a 57% water rate increase for DCRW.

[9] On January 24, 2017, the trial court entered its judgment, concluding, *inter alia*, that the City was bound by the Contract; the Ordinance's rate increase as to DCRW breached the Contract; and the provisions of the Contract regarding the DCRW rate increase could not be severed from the provisions raising the rates on non-City-residents, thereby invalidating the entire Ordinance. The trial court's order provides, in part, as follows:

### FINDINGS OF FACT

….

23. At the hearing in this cause both [City] Mayor Wellman and Washington witness David Dahl testified that all prior increases had been across-the-board (pro-rata as to all consumers) and improvements made to Washington's system since 1992 had been recovered through those rate increases.

….

47. At the hearing in this cause, DCRW Witness Mr. Kerry Heid raised several serious concerns about the 2016 Umbaugh study and Mr. Dean Rogers, on behalf of the City of Washington, responded to these criticisms.

48. Accordingly, the Court finds that the question of how much it currently costs Washington to serve DCRW is in dispute.

….

51. The July, 2016 Umbaugh report calculates the City of Washington's revenue requirement utilizing depreciation expense.

52. The evidence revealed that the 2012 and 2014 reports utilized a detailed extension and replacement budget instead of the depreciation expense figure.

53. Depreciation changed very little among 2012, 2014 and 2016. (See Pl.'s Ex. 59; see also Pl.'s Exhs.3, 14, 17 and 18.)

54. However, by switching from the budgeted improvements method to depreciation resulted in an increase to Washington's revenue requirement by more than $400,000 per year. (See Pl.'s Ex. 59).

55. The Court finds that this is not an actual increase in costs, but an increased assignment of capital costs that the City of Washington was already incurring and had already shared proportionately with all consumers (including DCRW) through the last rate increase in 2012.

56. The Court makes this finding concerning the change in methodology based on some of the following facts and evidence. On cross-examination the City of Washington witness, Mr. Dean Rogers, confirmed that: (1) Washington's revenue requirements have only increased by about 15.7% since 2012 according to Umbaugh's calculation; (2) when total costs being incurred by Washington in 2012 (as reflected in the 2012 Umbaugh report) were adjusted to measure them the same way as in the July, 2016 Umbaugh report (i.e., using depreciation expense in the revenue

requirement calculation as opposed to an extension and replacements budget), costs have only increased by approximately 5.89%; and (3) Mr. Rogers did not know the difference between what he contends is the current cost to serve DCRW and what that cost was in 2012 when DCRW incurred its last rate increase. (See Pl.'s Ex. 59.)

57. Additionally, Mr. Seever, who was a Witness for the City of Washington, testified that he would not expect DCRW'S relative share of the costs to have changed since 2012. (See Pl.'s Ex. 55, p. 31, lines 8-12.)

58. The 2016 Umbaugh report shows (at page 15) the derivation of the revenue requirement Washington allocated to DCRW, which directs the portion of debt service and depreciation based on the allocation of capital plant derived on page 10. It also shows the operating expenses and taxes apportioned on the basis of allocated capital plant at pages 12 and 13. P1.'s Ex. 3, pp. 10,12,13 & 15.

59. The Court finds that the City of Washington has not demonstrated that its proposed rate increase to DCRW is based upon a "demonstrable increase in costs" as required in the contract since the contract was last modified by changing rates in 2012.

….

67. All rates in a rate ordinance are interrelated such that if the Court were to find one rate is unlawful, it would impact other rates in the ordinance.

68. The rate ordinance at issue herein (Ordinance No. 12-2016) does not contain a severability clause.

….

81. To the contrary the most credible testimony to the Court indicates that at best the City of Washington could only demonstrate an increase of 5.89% as to DCRW.

82.  The Court heard and observed the witnesses who testified at trial and weighed their respective credibility and demeanor in assigning the weight to be given to their testimony.

…

CONCLUSIONS OF LAW

….

15.  Washington cannot increase DCRW's rates on a basis other than proportionately [sic] without first demonstrating that the increase is based on a demonstrable increase in costs not including an increased share of capitalization.  If Washington's performance can be justified simply by claiming that it is entitled to rely on its expert, the contractual commitment is meaningless. *Accord City of Baxter v. Smith Util. Dist.*, 1987 Tenn. App. LEXIS 2543 (Tenn. Ct. App. 3/16/1987) at *9 (see also endnotes *infra*).

….

20.  Paragraph C.5[.],"Modification of Contract", explicitly limits the City of Washington's authority to raise rates at its sole discretion[] and requires the City of Washington to show that any attempted rate increase is based on an actual increase in Washington's costs to serve DCRW, not including costs associated with an increased share of the capitalization of the City of Washington's system.

21.  For purposes of interpreting the contract, a "demonstrable increase or decrease in the costs of performance" means based upon an increase or decrease in the costs of performance *since the last rate increase.  Utilities Bd. of City of Tuskegee v. Town of Notasulga*, 530 So. 2d 228, 229-30 (Ala. 1988) (holding that (1) that the period over which the demonstrable increase is to be calculated is since the last time rates were modified and (2) the provision would not allow a disproportionate increase.)

22.  Since the last rate change in 2012, Washington has only demonstrated an increase in costs of at most 5.89% and not 57%. Washington's witnesses Mr. Rogers and Mr. Seever[] both

admitted that Washington does not know the cost to serve DCRW as of 2012.

….

33. The Court finds that the contract is enforceable against the parties in accordance with its terms and the modification provision of the contract prohibits a rate increase without first showing a demonstrable increase in the costs of performance and further prohibits assigning an increased share of capitalization to DCRW. Beyond a 5.89% cost increase according to Washington's calculations (which DCRW also contested), there has been no demonstrable increase in Washington's costs to perform under the contract since 2012. As a result, the proposed rate increase is improper.

34. Because the City of Washington's proposed rate increase to DCRW per Ordinance 12-2016 is not based upon a demonstrable increase in the costs of performance under the contract since 2012, the ordinance is in breach of the contract and, therefore, is unlawful.

….

37. The ordinance at issue (12-2016) setting rates contains no severability clause and is, therefore, presumed to be not severable.

38. Since the Ordinance 12-2016 setting the wholesale rate to be charged DCRW is invalid and there is no severability clause, the lack of a severability clause renders the entire rate ordinance invalid.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that judgment be entered against the Defendants on the breach of contract action, that Ordinance No. 12-2016 adopted by the City of Washington is hereby declared void, and Washington's Motion to Dismiss this action is DENIED. The bond posted by DCRW is ORDERED hereby released.

Order pp. 2, 4, 6-8, 10, 12, 13, 14, 15 (some formatting altered).

# Discussion and Decision

## Standard of Review

[10] DCRW moved the trial court to issue findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. In such cases, we employ a two-tiered standard of review:

> "[W]e determine whether the evidence supports the trial court's findings, and we determine whether the findings support the judgment. We will not disturb the trial court's findings or judgment unless they are clearly erroneous. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. In determining whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom."

*Infinity Prod., Inc. v. Quandt*, 810 N.E.2d 1028, 1031–32 (Ind. 2004) (quoting *Bussing v. Ind. Dep't of Transp.*, 779 N.E.2d 98, 102 (Ind. Ct. App. 2002) (citations omitted), *trans. denied*.).

## I. Whether the Trial Court Erred in Concluding that the City Breached the Contract

[11] The trial court concluded that the City breached the Contract by passing the Ordinance, which would have raised DCRW's rates approximately 57%. The trial court found that the City had failed to establish that the rate increase was based on a "demonstrable increase or decrease in the costs of performance hereunder [and did not] include increased capitalization of the seller's system."

Appellant's App. Vol. II p. 40. The City argues that (1) the trial court erred in not giving its decision the deference it would receive in a typical rate-making case; (2) DCRW—not it—had the burden of proof, even under a contract theory; and (3) DCRW failed to carry its burden of proof. DCRW counters that the trial court correctly (1) treated this as a contract case, (2) concluded that the City was bound by the Contract, and (3) found that the City failed to establish a demonstrable increase in costs of performance that would justify a rate increase.

## A. Rate-Making or Contract

[12] As an initial matter, the parties are in conflict regarding how the trial court was supposed to review the Ordinance. The City contends that it was engaging in the legislative function of rate-making, entitling it to a great deal of deference. DCRW counters that the City is entitled to no such deference in this case as it was acting pursuant to the Contract and therefore bound by its provisions. On this point, we agree with DCRW.

[13] The Indiana Supreme Court has addressed a similar question and concluded that contractual obligations which limited the municipality's exercise of its legislative powers were valid. *S. Ind. Gas & Elec. Co. v. City of Boonville*, 252 Ind. 385, 391, 248 N.E.2d 343, 346 (1969). In *Boonville*, Boonville sought to provide electrical service to two subdivisions it had recently annexed and, to that end, brought a condemnation action against Southern Indiana Gas & Electric's transmissions lines in the subdivisions. *Id*. at 386–88, 248 N.E.2d at 343–45. At the time, Boonville was purchasing its electricity from Southern Indiana Gas

& Electric, and, as part of the purchase contract between the parties, Boonville agreed not to extend its services beyond the city's limits as they existed on June 6, 1941 (which, of course, excluded the newly-annexed subdivisions). *Id*. at 387, 248 N.E.2d at 344.

[14] Boonville argued "that the contractual provision is invalid because the city, in effect, contracts away its power of eminent domain." *Id*. at 388–89, 248 N.E.2d at 345. The *Boonville* Court rejected this argument, concluding that

> The delegation of the powers of eminent domain for the operation of a utility is for business purposes, as distinguished from a governmental or a sovereign purpose. The exercise by a municipality of its eminent domain powers in connection with its utility operations therefore involved a proprietary or a business-like decision. It is simply a business operation.

*Id*. at 389, 248 N.E.2d at 345.

[15] The *Boonville* Court went on to cite several Indiana Supreme Court precedents as support for this proposition:

> *In City of Vincennes v. Citizens' Gas Light Company* (1892), 132 Ind. 114, 126, 31 N.E. 573, 577, 16 L.R.A. 485, it is said:
>
> > "There is a distinction between powers of a legislative character and powers of a business nature. The power to execute a contract for goods, for houses, for gas, for water, and the like, is neither a judicial nor a legislative power, but is a purely business power. * * *"
>
> Also, in *City of Indianapolis v. Indianapolis Gas-Light & Coke Company* (1879), 66 Ind. 396, 407, our Court said:
>
> > '* * * When it (a municipal corporation) makes a contract within the scope of its power * * *, it must be enforced the

same as the contract of a business corporation, or a person. * * *' (Parenthesis added)

In the case of *Public Service Co. of Ind. v. City of Newcastle* (1937), 212 Ind. 229, 237, 8 N.E.2d 821, 825, this Court stated:

'It is well settled that, when furnishing electric energy to light its streets, buildings, and public places, the city is exercising a governmental function, but that, when it furnishes and sells energy for domestic and commercial purposes, it acts as a private business corporation, and, in the latter case, it is subject to the rules governing private corporations.'

In the operation of a utility a city is bound in the same fashion as any other owner of a utility, corporate or otherwise, and may contract with reference to the disposition of such property and its operation. *Department of Treasury v. City of Linton* (1945), 223 Ind. 363, 60 N.E.2d 948; *Chadwick, Treasurer v. City of Crawfordsville* (1940), 216 Ind. 399, 24 N.E.2d 937, 129 A.L.R. 469; *Public Service Co. of Ind. v. City of Newcastle*, *supra*; *City of Huntington v. Northern Ind. Power Co.* (1937), 211 Ind. 502, 5 N.E.2d 889, 6 N.E.2d 335; *City of Logansport v. Public Service Comm*. (1931), 202 Ind. 523, 177 N.E. 249, 76 A.L.R. 838.

*Id*. at 389–90, 248 N.E.2d at 345.

The Court held that Boonville could not exercise its eminent domain powers to take possession of the lines and poles in question, concluding that "the City of Boonville is bound by its contract made in good faith in operating a utility as a proprietor. Once appellee engaged in a public utility business, it became bound by its business decisions, the same as any other utility." *Id.* at 391, 248 N.E.2d at 346.

[17] We see no meaningful distinction between this case and the situation presented in *Boonville*. By participating in the public utility business by selling water to DCRW, the City is bound by its business decisions, which are not due the deference that a purely legislative decision would be. The City argues that DCRW's argument is a straw man, as it has never claimed that it is not bound by the Contract. Be that as it may, the City is still trying to argue that its rate-making decisions are due the extreme deference that legislative decisions receive. We do not, however, see how this particular circle can be squared. Being bound by the Contract's provisions regarding rates removes rate-making (at least in the case of DCRW) from the realm of legislative decision-making.

## B. Burden of Proof

[18] The City notes that the trial court concluded that "the burden is on the City when they are trying to alter rates (or rate methodology) set by contract." Order p. 9. The City contends that the burden of proof in this case is actually DCRW's. We assume, without deciding, that the City is correct on this point. At least in this case, however, where both parties presented ample evidence to support their respective positions, we do not see how burden shifting, even if erroneous, could have made the slightest bit of difference to the outcome. In any event, the City points to nothing beyond the trial court's statement above to

indicate that the trial court improperly evaluated either party's evidence due to erroneous burden shifting.[2]

## C.  Whether the City Breached the Contract

[19]     The City contends that DCRW failed to meet its burden of proof to establish that the City breached the Contract by increasing its rates without being "based on a demonstrable increase … in the costs of performance[.]"  Appellant's App. Vol. II p. 40.  Most of the evidence submitted at trial focused on whether a demonstrable increase in the costs of the City's performance of the Contract was established or refuted.

[20]     The City claims that the trial court erroneously concluded the City's switch to the depreciation method did not reflect the actual increase in costs.  The City does not dispute that the switch to the depreciation method resulted in a $400,000 increase in revenue requirements and acknowledges that "reasonable minds can differ as to which accounting method is preferable[.]"  Appellant's Br. p. 30.  The City acknowledges the testimony from their witness Rogers, who agreed that if the depreciation method had been used in the 2012 Umbaugh report, revenue requirements would have only increased 5.89% in the interim. The City nonetheless argues that such a switch in accounting methods is within its rate-making discretion and should be afforded substantial deference.  As we

---

[2]  As a practical matter, the utility in a case such as this (at least if it wants to win) is almost certainly going to have to introduce evidence that a proposed rate increase is based on an increase in the costs of performance, regardless of which party technically has the burden of proof.  As mentioned, in this case both parties produced substantial amounts of evidence touching on the question.

have concluded, however, this is not a case in which the City's business decision is due the substantial deference that courts show to legislative decisions. It was within the trial court's discretion to credit evidence that the City's revenue requirements would only have increased 5.89% since 2012 had the City been consistent with its accounting methods. Put another way, the trial court was entitled to believe that an increase in revenue requirements that would not have occurred without a change in accounting methods was not an actual increase. In the end, both sides presented evidence to support their positions, and the trial court found DCRW's to be more credible. The City's argument in this regard is an invitation to reweigh the evidence, which we will not do.

[21] The City also argues that, even if one accepts the trial court's finding that the actual revenue requirements had only increased some 6% since the 2012 rate increase, this is still a demonstrable increase, presumably fully justifying a 57% rate increase. This argument, however, does not account for the contractual requirement that a rate increase must be "based on" the demonstrable increase in the cost of performance.

[22] Were we to accept the City's apparent contention that any demonstrable increase in cost of performance—however slight—could justify *any* rate increase, the requirement that a rate increase be "based on" a cost increase would be rendered meaningless.

> When interpreting a contract, the contract must be read as a
> whole and the court should accept an interpretation of the

contract that harmonizes its provisions. [*OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1315 (Ind. 1996)]. We also should make every effort to avoid a construction of contractual language that renders any words, phrases, or terms ineffective or meaningless. *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1316 (Ind. Ct. App. 1991), *trans. denied*. Courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions. *George S. May Intern. Co. v. King*, 629 N.E.2d 257, 261 (Ind. Ct. App. 1994), *trans. denied*.

*Ind. Gaming Co., L.P. v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000), *trans. denied*.

[23] We have little trouble concluding that a 57% rate increase cannot be based on a 5.89% increase in the cost of performance. To "base on/upon" may be defined as "to form, make, or develop (something, such as an opinion, decision, or calculation) by using (something, such as information) as a basis, starting point, etc." *https://www.merriam-webster.com/dictionary/base%20on/upon* (last visited November 22, 2017). A contract provision specifying that a rate increase be based solely on a cost increase leads to the unavoidable conclusion that the parties intended that there be a strong correlation between the two figures. While Section C.5. seems to allow for some deviation, we do not believe that a reasonable person would think that a 57% rate increase could be "based on" a mere 6% cost increase.[3]

---

[3] We leave the question of just how much deviation might be acceptable for another day. We do not believe that this is a close case, however.

[24] Our conclusion is consistent with the Alabama Supreme Court's interpretation of the exact same contract language in *Utilities Board of City of Tuskegee v. Town of Notasulga*, 530 So. 2d 228 (Ala. 1988). In that case, the seller of water sought to increase buyer's water rates 100% based on a demonstrated increase in cost of performance of from 17% to 22%:

> The Board's position is that it is not limited under that provision to a rate increase directly proportional to the increased cost of producing water, but, rather, that upon a showing of any production cost increase, however slight, the Board is entitled to an increase-even a disproportionate increase, and, in this case a 100% increase.
>
> …
>
> We find that the "Modification of Contract" provision at issue is unambiguous and, giving it a reasonable construction, that it clearly relates an increase in rates paid by [buyer] to the actual increase in the [seller]'s cost of production. Thus, the dispositive issue is by what percentage the [seller] may increase the rate [buyer] pays based upon the actual increase in its cost of production from May 1, 1981, to October 1, 1984.

*Id*. at 229–30. We find the *Tuskegee* Court's approach to be reasonable and adopt it for this case. Given the large disparity between the actual increase in the City's cost of performance and the Ordinance's rate increase, we conclude

that the trial court did not abuse its discretion in concluding that the City has breached the Contract.[4]

## II. Severability of the Provisions of the Ordinance

[25] The City argues that even if the Ordinance is invalid as to DCRW, the trial court erred in invalidating the rate increase of 14.8% as to out-of-City customers. Section 10.07 of the City's Code of Ordinances provides, in part, as follows:

§ 10.07 SEVERABILITY.

(A) If any section of this code now enacted or subsequently amended or its application to any person or circumstances is held invalid, the invalidity does not affect other sections that can be given effect without the invalid section or application.

(B) Except in the case of a section or amendment to this code containing a nonseverability provision, each division or part of every section is severable. If any portion or application of a section is held invalid, the invalidity does not affect the remainder of the section unless:

(1) The remainder is so essentially and inseparably connected with and so dependent upon the invalid provision or application that it cannot be presumed that the remainder

---

[4] DCRW also argues that federal law supports a conclusion that the City breached the Contract, noting that DCRW has borrowed from the United States Department of Agriculture's Rural Utility Service ("RUS") in the past. The RUS lends money to rural utilities like DCRW, who must comply with various federal regulations, among which are that a purchase contract with a supplier "[s]pecify the initial rates and provide a type of escalator clause which will permit rates for the association to be raised or lowered proportionately as certain specified rates for the supplier's regular customers are raised or lowered." 7 C.F.R. § 1780.62(c). Because Indiana contract law is sufficient to determine the issue, we need not address how federal law or regulations apply.

would have been enacted without the invalid provision or application; or

    (2) The remainder is incomplete and incapable of being executed in accordance with the legislative intent without the invalid provision or application.

[26] The City argues that the trial court erroneously concluded that the Ordinance was presumed to be nonseverable due to its lack of a severability clause. We agree with the City on this point of law. Section 10.07 makes it clear that, in fact, the opposite is true: *Severability* is presumed in the absence of a nonseverability clause.[5]

[27] The question, then, is whether the record is sufficient to sustain the trial court's conclusion that the Ordinance is nonseverable, and we conclude that it is not. As the City points out, DCRW did not raise the severability issue until its post-trial brief, which means that the issue was not litigated at trial. Not surprisingly, then, there is no evidence in the record to support the trial court's finding that "[a]ll rates in a rate ordinance are interrelated such that if the Court were to find one rate is unlawful, it would impact other rates in the ordinance." Order p. 8. Indeed, even if we assume the above to be true, it would not necessarily support a conclusion that "[t]he remainder is so essentially and inseparably connected with and so dependent upon the invalid provision or application that it cannot be presumed that the remainder would have been

_____

[5] This proposition is consistent with Indiana law regarding statutes. *See* Ind. Code § 1-1-1-8 ("Except in the case of a statute containing a nonseverability provision, each part and application of every statute is severable.").

enacted without the invalid provision or application[.]" WASHINGTON, IND., CODE OF ORDINANCES § 10.07(B)(1). While the notion that all rates in a rate ordinance are interrelated does not seem unreasonable at first blush, we are unprepared to affirm such a finding in the absence of any evidence to support it. We conclude that the trial court erred in deeming the Ordinance to be nonseverable and reverse that portion of its judgment invalidating it in its entirety.

## III. The Trial Court's Refusal to Dismiss the Declaratory Judgment Action

[28] Finally, the City contends that the trial court erroneously retained jurisdiction over DCRW's declaratory judgment action because that claim allegedly amounts to an attempt to circumvent the procedures for challenging utility rate hikes detailed in Indiana Code section 8-1.5-3-8.2. The City's argument is based on the false premise that DCRW somehow "circumvented" section 8-1.5-3-8.2. Far from being circumvented, the statutory claim was pursued simultaneously. Moreover, the City acknowledges that the issues raised in both causes of action are identical, and the City does not claim, much less establish, that DCRW violated any of section 8-1.5-3-8.2's requirements.[6] The City has

---

[6] The City does claim, however, that DCRW engaged in forum shopping, suggesting that DCRW filed a declaratory judgment action and subsequent consolidation motion in order to hand-pick the court that would adjudicate its challenge to the Ordinance. The City, however, fails to explain how being in Daviess Circuit Court would help DCRW or hurt the City. In any event, even if we assume that having the case heard in Daviess Circuit Court conferred some advantage upon DCRW, it seems that DCRW could have simply filed its statutory challenge there in the first place.

failed to establish that the trial court abused its discretion in consolidating the causes of action or in denying the City's motion to dismiss the declaratory judgment action.

# Conclusion

[29] We conclude that the trial court did not abuse its discretion in finding that the City breached the Contract by enacting the Ordinance and, therefore, the Ordinance as it relates to DCRW is null and void. We conclude, however, that the trial court erroneously invalidated the entire Ordinance based on its conclusion that it was nonseverable and, therefore, the Ordinance as it relates to the out-of-City customers (other than DCRW) remains in full force and effect. Finally, we conclude that the trial court did not err in declining to dismiss DCRW's declaratory judgment action or in consolidating the two causes of action.

[30] The judgment of the trial court is affirmed in part and reversed in part.

Riley, J., and Robb, J., concur.